# EXHIBIT 5

Page 1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MARYLAND

2                 (Greenbelt Division)

   ------------------------------:

3  COLUMBIA GAS TRANSMISSION, LLC,:

4  d/b/a COLUMBIA PIPELINE GROUP  :

5                 Plaintiff,      :

6      vs.                        : Case No.

7  JANET MALIN HAAS, et ux.,      : 8:17-cv-01147-TDC

8                 Defendants.     :

9  ------------------------------:

10              DEPOSITION OF MELVIN HAAS

11

12  DATE:          WEDNESDAY, SEPTEMBER 13, 2017

13  TIME:          11:25 A.M.

14  LOCATION:      TENENBAUM & SAAS P.C.

15                 4504 Walsh Street, Suite 200

16                 Chevy Chase, Maryland  20815

17

18  REPORTED BY:   SUZANNE MARIE ALONA ENDERSON

                   Reporter, Notary

19

                  VERITEXT LEGAL SOLUTIONS

20                 MID-ATLANTIC REGION

              1250 Eye Street NW - Suite 350

21               Washington, D.C.  20005

Page 2

## APPEARANCES

On behalf of the Plaintiff:
    MICHAEL DINGMAN, ESQUIRE
    Reed Smith LLP
    7900 Tysons One Place
    Suite 500
    McLean, Virginia  22102
    (703) 641-22102

On behalf of the Defendants:
    BRADSHAW ROST, ESQUIRE
    Tenenbaum & Saas P.C.
    4504 Walsh Street
    Suite 200
    Chevy Chase, Maryland  20815
    (301) 961-5300


ALSO PRESENT:
    JANET HAAS

Page 3

## CONTENTS

EXAMINATION BY:                         PAGE
Counsel for Plaintiff              4


EXHIBITS        DESCRIPTION        PAGE








(* No exhibits marked.)


Page 4

PROCEEDINGS
WHEREUPON,
        MELVIN HAAS
called as a witness, and having been first duly
sworn, was examined and testified as follows:
    EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MR. DINGMAN:
    Q   Please state your name, sir.
    A   Melvin Leroy Haas.
    Q   What is your current address, Mr. Haas?
    A   421 Brighton Knolls Drive, Brinklow,
Maryland, 20862.  The same as my wife.
    Q   Okay.  I introduced myself during your
wife's deposition.
    A   Correct.
    Q   You understand that I represent Columbia
Gas in this case.  Have you been deposed before?
    A   Yes.
    Q   On how many occasions?
    A   Maybe five.
    Q   Okay.  When was the most recent?

Page 5

    A   Probably about 12 years ago.
    Q   Okay.  Well, while you have some
experience with depositions and you heard me give
some instructions to your wife, let me just go
over again sort of the ground rules of the
deposition.
        I'll be asking you questions about this
case.  And, again, if the question doesn't make
sense to you or you simply do not understand it,
let me know, and I'll rephrase it.  Otherwise I'll
assume that you understood the question.
        And, of course, you have to give verbal
responses.  No "uh-huhs" or head nods.  Everything
needs to get recorded correctly.
        And if you need to take a break, just let
me know and we can do that.
    A   Okay.
    Q   Other than this case, have you been a
party to any other lawsuits?
    A   Yes.
    Q   How many?

Page 6

1    A    The years fly by. I'm guessing
2  approximately four others.
3    Q    When was the most recent of those cases?
4    A    That would have been approximately 12
5  years ago. I wish I had looked that up. I should
6  have anticipated that.
7    Q    That's okay. What was -- were you the
8  plaintiff or the defendant in that case?
9    A    Defendant. In each case of those
10  lawsuits I was the defendant.
11    Q    Just so we're clear, were you
12  individually a defendant, or was it an entity that
13  you had an ownership interest in?
14    A    An entity I had an ownership interest in.
15    Q    Okay. What's the name of that entity?
16    A    It was Aqualine Associates.
17    Q    Aqualine?
18    A    Aqualine Associates.
19    Q    What was your connection or ownership
20  interest in the Aqualine?
21    A    I was the sole owner of Sand Glass, Inc.,

Page 7

1  what was the corporate general partner.
2    Q    What kind of work was Aqualine involved
3  in?
4    A    A nursing home.
5    Q    How about Sand Glass?
6    A    They were the owners of that building.
7    Q    So the same? A nursing home?
8    A    Yes.
9    Q    So all of these prior lawsuits that you
10  mentioned, the four others, involved that entity?
11    A    No.
12    Q    Okay. So we have Aqualine. That was the
13  most recent one?
14    A    Yes.
15    Q    And that was approximately 12 years ago?
16    A    I'm guessing. It could have been 11. It
17  could have been 14.
18    Q    How about the other cases?
19    A    Involved C&L Limited Partnership of which
20  I'm the general partner. My wife is a limited
21  partner.

Page 8

1    Q    What was the business of that entity?
2    A    Nursing home.
3    Q    In these four prior lawsuits did any of
4  the issues in those lawsuits involve real property
5  or real estate?
6    A    Yes. Always.
7    Q    Well, let's start with the most recent
8  one. What was that issue in that case?
9    A    I'll try to summarize it as simply as
10  possible. Our tenant was making an attempt to
11  take over the bed rights of our nursing home. And
12  we found out as we got into it that the Genesis
13  Corporation was behind it. And ultimately they
14  wanted to destroy the facility, basically, and rob
15  us of our bed rights so that they could fill their
16  370-bed facility just down the road. We
17  ultimately exposed that which was problematic for
18  them.
19    Q    This was the Aqualine case?
20    A    Yes.
21    Q    Turning now to the lawsuits involving C&L

Page 9

1  Limited Partner, did any of those involve any real
2  estate or real property issues?
3    A    Yes. The tenant -- it was a nursing home
4  I had formally run, and that's where my wife had
5  been nursing director for some time. The
6  tenant -- and that's the one, I think, is two or
7  three cases. Interestingly, it was kind of like
8  Columbia.
9        Some time after the leases were executed
10  they didn't like what was in it. So he was coming
11  back to court to try to rewrite and insert stuff
12  that didn't exist in there. And he didn't learn
13  the first time. He lost. Each time he lost
14  because it was dishonest.
15    Q    What were the leasing issues in those
16  cases?
17    A    Regarding the expansion of the facility
18  and the terms of that. That's it, in essence.
19    Q    Who was the other party in those cases?
20    A    Ronald G. Carsell.
21    Q    What was the time frame during which

3 (Pages 6 - 9)

Page 10

1  those cases were pending?
2      A   I knew you would ask that.
3      Q   The best estimate that you can give is
4  fine.
5      A   I sold the facility about -- what was it?
6      THE WITNESS:  Seven years ago now, Janet?
7  Off the record.
8      (Discussion off the record from 11:31 to
9  11:32 a.m.)
10     THE WITNESS:  What was your question
11 again?  I'm sorry.
12 BY MR. DINGMAN:
13     Q   My question is, what was the time frame
14 during which these lawsuits involving C&L Limited
15 Partnership were pending?
16     A   It would have been some time prior to
17 seven years ago.  What would that make it?  2003,
18 2004.  I don't know.  I would not want to be held
19 responsible for any answer I would give nailing
20 down that time.  That was years ago.
21     Q   Where were those -- were those cases all

Page 11

1  filed in the same court?
2      A   It seems one was in Baltimore Federal
3  Court, and I think two were here in Montgomery
4  County, I think.
5      Q   Can you describe for me, Mr. Haas, your
6  educational background?
7      A   Yes.  I went to our church -- or Seventh
8  Day Adventist Church School through eighth grade
9  and then went one year to public school in
10 Danville, Pennsylvania, and then the next three
11 years were at Blue Mountain Academy where my wife
12 and I both attended in Hamburg, Pennsylvania.
13     Then I went to Columbia Union College.
14 Spent about three years or so there and then went
15 down for about a year and a half to Benjamin
16 Franklin University which at the time was a school
17 of accounting in D.C.
18     Q   Did you obtain any degree from Columbia
19 Union?
20     A   No.  I was just shy of my degree there.
21     Q   What was your course of study there?

Page 12

1      A   I was taking -- I started out taking some
2  sciences.  Found out that I wasn't real interested
3  in that.  That's when I switched to business.
4      Q   How about with Benjamin Franklin?  Any
5  degrees from that institution?
6      A   No because during that time I had a job
7  offer to become administrator at the Althea
8  Woodland which later on we would purchase and own.
9      Q   That's a good segue into -- I was going
10 to ask you about your --
11     A   I grew up very, very poor --
12     Q   -- work experience.
13     A   -- in Pennsylvania on a tiny farm.  Some
14 interesting twists and turns took place that led
15 me to where I got eventually.
16     Q   Starting with when you finished up at
17 Benjamin Franklin, can you describe your work
18 history coming forward?
19     A   Yes.  I was involved at the Althea
20 Woodland and ran that facility for some time.
21 Then I leased it, I think, in '76 or '77.  And

Page 13

1  then sold real estate for a while.
2      Q   Did you have a real estate agent's
3  license --
4      A   Yes.
5      Q   -- in Maryland?
6      A   Yes.  With Shannon & Luchs at the time
7  which I think is history now.
8      Q   How long were you a real estate agent?
9      A   It was primarily part time, and I'm
10 guessing over a period of three or four years at
11 that time.
12     MR. ROST:  I know it's natural to try to
13 look to your wife for an answer.  But if you --
14     THE WITNESS:  To see if she can --
15     MR. ROST:  -- don't recall, just say you
16 don't recall.
17     THE WITNESS:  Okay.  It was three or four
18 years, maybe.
19 BY MR. DINGMAN:
20     Q   During what time frame?
21     A   '78 onward.

4 (Pages 10 - 13)

Page 14

1    Q    What type of real estate were you
2  involved in as an agent?
3    A    Residential and some quasi-commercial.
4  Sold a nursing home in Hillandale and some
5  farmland out -- for development out in Beltsville,
6  that type of thing.
7    Q    Okay.  So you --
8    A    And residential houses.
9    Q    Okay.  So you mentioned to me Althea and
10  working as a real estate agent.  What time frame
11  does that bring us up to?
12    A    About the '80s.  Then I was involved in
13  the overseeing of the nursing homes and the
14  properties that we had leased.
15    Q    This was through the C&L Limited
16  Partnership?
17    A    And Aqualine Associates.
18    Q    What was your role in that business?
19    A    In which one?
20    Q    The C&O?
21    A    In C&L?

Page 15

1    Q    C&L.  I'm sorry.
2    A    I was the general partner.
3    Q    What was your role, if there was one, in
4  managing or overseeing the nursing home?
5    A    I was the president of Sand Glass, Inc.,
6  the general partner, and a limited partner in
7  Aqualine Associates.
8    Q    More generally, what was your day-to-day
9  function as the president or the limited partner?
10    A    In just making sure that the rental
11  payments were collected.  Making sure that any
12  issues that would arise were dealt with.
13    Q    And at some point -- well, did there come
14  a time when you retired?
15    A    Yes.  That would probably be -- because
16  of the way my business was structured, my actual
17  retirement was probably around -- I'm 73 now.  So
18  I was probably about 65, 66, and we began
19  divesting the properties.  And we're totally out
20  now, thank God.
21    Q    I would like you to take a look at the

Page 16

1  complaint in this case that was previously marked
2  as Exhibit 13.  We have already established the
3  authenticity of the exhibits attached there.  So I
4  won't go back over those.  But I do want to go
5  back and ask about the purchase of your home which
6  was in approximately March of 1975?
7    A    Correct.
8    Q    And the home was bought from the builder?
9    A    Correct.
10    Q    Did you have any involvement in the
11  construction of the home?
12    A    No.  In fact, it had been sitting there,
13  as I understand, for a year -- up to a year and a
14  half prior to our purchase.  At that time it was
15  considered way out.
16    Q    So the home had been completed for
17  approximately a year when you bought it?
18    A    Yes.
19    Q    At the time that you purchased the
20  home -- you can take a look at Exhibit 2 to the
21  complaint if that assists you -- were you aware

Page 17

1  that there was a gas transmission pipeline that
2  was running through the property?
3    A    Yes.
4    Q    Were there any markers or any indications
5  on your property identifying the location of the
6  pipeline?
7    A    No.
8    Q    If you could take a look at what was
9  previously marked as Exhibit 14, it is a one-page
10  plat.
11    A    Yes.  I'm familiar with that.
12    Q    Have you seen this before?
13    A    Yes.
14    Q    Did you have this plat at or around the
15  time you purchased the home in 1975?
16    A    That's correct.
17    Q    Is this what's sometimes referred to as a
18  house location survey?
19    A    Yes.
20    Q    So it is showing the location of the home
21  and other, for example, right-of-ways, correct?

5 (Pages 14 - 17)

1  A   Yes.
2  Q   So looking at Exhibit 14, just from your
3  own recollection, is the tree planted essentially
4  in the middle of the right-of-way that's depicted
5  on this plat?
6  A   It's planted, essentially, two feet
7  approximately off center.
8  Q   Okay.  Have you measured that?
9  A   As best I could but it's a tree trunk.
10  Q   Well, let me back up.  So how did you
11  measure that -- the distance --
12  A   With my tape.
13  Q   -- from the pipeline?
14  A   With my tape.
15  Q   Okay.  So let me ask you this then:  How
16  far is the tree from the corner of the house?
17  A   I believe that's about 23 feet, something
18  like that.
19  Q   That's something you have measured
20  yourself?
21  A   Yes.  That's approximate, but depending

1  on where you hit the trunk.  If you hit it at the
2  furthest, it's -- you know, it's not perfectly
3  round.  Depending on where you hit the trunk.
4  Q   So when you say the tree is two feet off
5  centerline --
6  A   Towards the house.
7  Q   Towards the house?
8  A   Yes.
9  Q   Okay.  So approximately 25 feet would be
10  the pipeline and the tree is at 23 feet?
11  A   That's approximately correct because I
12  saw the yellow flags they had there too that they
13  marked.
14  Q   So at some point Columbia came out and
15  marked the pipeline?
16  A   When they were coming through with
17  SavATree.
18  Q   Okay.  If you could take a look at
19  Exhibit 3 to the complaint which, again, is the
20  right-of-way agreement at issue in this case.  My
21  first question for you is, when is the first time

1  you saw this document?
2  A   At settlement.
3  Q   At settlement when you bought the house?
4  A   That's correct.
5  Q   So you've had a copy of this document for
6  the last 42 years?
7  A   Yes.
8  Q   I'm just asking your understanding as the
9  property owner.  What is your understanding of
10  Columbia's rights under this document?
11  A   Well, it's very simply and clearly stated
12  in this right-of-way agreement that they have the
13  right to have access during the period that they
14  install it and to have access over the property as
15  they travel to and come with their pipes and
16  equipment and that they would lay it and maintain
17  it, be low cultivation so that we would have the
18  right to enjoy the property, or the Eshlemans in
19  the case of the original grantor.
20  Q   And you agree that the rights to enjoy
21  the premises are subject to the right to maintain

1  and operate the pipeline, correct?
2  A   Absolutely.  No question.
3  Q   Why do you contend that planting the tree
4  within two feet of the pipeline does not interfere
5  with Columbia's right to maintain and operate the
6  pipeline?
7  A   You know, Mr. Dingman, ever since you and
8  Columbia filed this case, it has centered
9  around -- and Antonio Redd pointed this out on his
10  visit to the house.  They're hanging their hat on
11  that comma, "subject to the rights of the grantee
12  to maintain and operate said lines."
13  But the definition for that last little
14  piece -- and you're an attorney.  So you even know
15  this better than I do.  If you go back to the
16  middle of the sentence before the comma where they
17  inserted the rights to fully use and enjoy the
18  premises, maintain below cultivation, subject to
19  the rights to the grantee to maintain and operate
20  the lines below cultivation.
21  I don't need my old English teacher to

Page 22

1  tell me how to read a sentence. There is nothing
2  in here that told us what to plant, who to call
3  before we plant, how high the plant should grow,
4  whether we should keep a ten-foot wide clear
5  section over the pipe and grass or ivy or pansies.
6       In fact, Antonio Redd, on one of his
7  visits to the house, made a very clear point. He
8  said, Mr. Haas, you don't understand. We're
9  trying to be good neighbors. And I heard that
10  until it nauseated me.
11       Karen Stevenson said it on the visit to
12  the house when she came out. And she came out
13  only under heavy duress, because I said, If you're
14  going to cut my tree down and destroy my property
15  where my wife and I have lived for 42 years, you
16  owe me the visit to my home to see what you're
17  going to destroy. And eventually she capitulated
18  and she agreed to come. I think she said she had
19  a trip to Texas and would swing by there on the
20  24th when they came out.
21       But we have the right to live there and

Page 23

1  enjoy our property. And there's nothing here --
2  we have abided by every paragraph, sentence and
3  period of our right-of-way agreement. We have not
4  breached one part of it. And yet we're being
5  sued. We're pulling money from our home equity
6  line to fund this blasted case that you and
7  Columbia with billions and billions and billions
8  and billions of dollars have to smash us like a
9  bug.
10       This isn't your house. You don't know
11  what this is like. So there's nothing in here
12  that dictates that they have a right to cut my
13  grass, let alone chop down my maple tree.
14       Q  So then you believe you can plant
15  whatever you want right on top of this pipeline.
16  Is that your position?
17       A  Absolutely not. The judge in a --
18       Q  Okay. Let me --
19       A  -- previous case --
20       Q  Hold on, Mr. Haas. Mr. Haas --
21       A  Wait. Mr. Redd --

Page 24

1       Q  -- let me ask the questions. Okay? What
2  then is the restriction you agree with respect to
3  planting on top of the pipeline?
4       A  Whatever is reasonable. Mr. Redd --
5       Q  What do you think is reasonable?
6       A  -- thought -- Mr. Redd --
7       Q  What do you think --
8       A  I'm going --
9       Q  -- Mr. Haas --
10       A  -- to tell you.
11       Q  -- I'm not here --
12       MR. ROST: All right.
13       THE WITNESS: If you let me --
14  BY MR. DINGMAN:
15       Q  -- to argue with you. I'm here to ask
16  questions --
17       A  If you ask a question, I have a right to
18  answer.
19       Q  I asked you a question --
20       MR. ROST: Hold on a second. Calm down
21  here. Let's just get the questions asked and

Page 25

1  answered. Let's not --
2       THE WITNESS: I'm trying to answer his
3  question, and he keeps interrupting.
4  BY MR. DINGMAN:
5       Q  You're not answering the question.
6  You're arguing with me. I'm not here -- I
7  understand your position and your passion for the
8  case. I'm here to find the facts. Okay? So when
9  you tell me that you agree that there is a
10  reasonable restriction to what can be planted on
11  the pipeline, my next question is --
12       A  Absolutely.
13       Q  -- what do you consider to be a
14  reasonable restriction?
15       A  And I'm going to answer your question if
16  you allow me to without interruption.
17       Q  Please proceed.
18       A  Mr. Redd brought a case out to me to show
19  that they never lose --
20       Q  That's not an answer to my question.
21       A  -- a case. It is. This is very

7 (Pages 22 - 25)

Page 26

1   pertinent to --
2       Q   I'm asking -- we'll get to Mr. Redd.  I'm
3   asking you -- you testified just one minute ago
4   that you agree that there's reasonable
5   restrictions to what you can plant on the
6   pipeline.
7       A   That's correct.
8       Q   I'm asking you what those restrictions
9   are.  We'll get to what Mr. Redd told you, but I'm
10  asking you to tell me what you believe those
11  restrictions are.
12          MR. ROST:  Counsel, you need to let him
13  answer the question.
14          MR. DINGMAN:  He's not answering the
15  question.
16          MR. ROST:  Well, you won't even let him
17  begin the answer.  He'll get to your answer --
18          MR. DINGMAN:  No.  I'm not entitled -- I
19  don't have to sit here and listen to argument.
20  BY MR. DINGMAN:
21      Q   I understand respectfully, Mr. Haas, your

Page 27

1   position.  What I'm trying to --
2       A   No.  You really don't.  You haven't --
3       Q   -- what I'm trying to --
4       A   -- let me express my position.
5       Q   -- find out are the facts behind it.
6   When you say there's a reasonable restriction,
7   there's a simple answer.  What is the reasonable
8   restriction you agree applies?
9       A   Any right-of-way, according to the judges
10  that we have looked at in the cases we have found,
11  state that unless the wording in the document --
12  the original land rights document borders the
13  absurd, the very words and letters of that
14  document prevail.  And so unless it's absurd, I
15  can't plant my giant California redwood there.
16          Mr. Dingman, all the way along that
17  pipeline -- a fifth grader could have found this
18  out.  And I know that you and Columbia have had to
19  have known this knowledge.  There are sycamore
20  trees right across the fence in my neighbor's
21  property.  Do you know how far the roots -- I know

Page 28

1   you get to ask the questions.  This is rhetorical.
2           Do you know how far the roots go out from
3   those sycamore trees and the three foot in
4   diameter American Elm just off of that
5   right-of-way?  They go out 160 to 420 feet from
6   those trees.  There is a web and a morass of roots
7   going down that pipeline that pales by comparison
8   with this little tiny red maple with 24-inch
9   roots.
10          And you're dragging my wife and I in
11  court and raising hell and high water for that
12  little tree, and those sycamores and American elms
13  and oaks are crisscrossing your pipeline, making
14  ten times the problem that that maple tree is.  So
15  there's your answer.  You can't do stupid stuff.
16      Q   Okay.  Well, you can't plant a redwood.
17  Why not?
18      A   Because I think those roots probably
19  would go way deeper than my red maple.  I haven't
20  researched that one, but I would surmise that that
21  would be the case.

Page 29

1       Q   So is it your position that the
2   reasonable limitation on planting on top of the
3   pipeline is tied to how deep the root system is at
4   the particular tree?
5       A   It would have to do not only with that,
6   but removing a 220-foot redwood would take a bit
7   longer, I think, than my red maple tree.  That
8   would be the absurd.
9       Q   So is -- and tell me if I'm wrong in
10  understanding your position as to what the
11  reasonable restriction would be.  It's based on,
12  in your view, the depth of the root for the
13  particular tree and what would be involved in
14  removing it?
15      A   Yes.  That would be correct.  In fact,
16  what I wanted to mention is that Mr. Redd came
17  out, and on one of his visits he explained to me
18  that they want to be good neighbors.  And right
19  over here, he said, in Howard County just across
20  the dam here, he said, We have farmers.  And we
21  allow them to plow their field.  They plant their

8 (Pages 26 - 29)

Page 30

1  corn.
2       I said, Whoa, whoa, whoa.  Back up a
3  minute.  You were just at the kitchen table not
4  long ago telling us that we had to plant pansies
5  and ivy where my tree is now planted.  And now
6  you're telling me that Howard County has a field
7  of corn running across your pipeline where they
8  plow and do deep root aeration.
9       He said, But the corn roots are shallow.
10  So did I take Antonio Redd's word for that?
11  Absolutely not.  I went on the Internet.  And it
12  didn't take me but five minutes to find out that
13  the corn roots grow three, four and up to six feet
14  deep which is a heck of a lot deeper than my red
15  maple roots, but they have a field full of them
16  running across their cornfield with corn that's
17  six to eight feet tall.
18       So I'm telling you that this lawsuit is
19  not about my maple tree.  It's about setting a
20  precedent like the Bowers case in Texas where the
21  judge said the lower court -- you stated in the

Page 31

1  lower court to the pipeline company that you're --
2  you don't want to set a precedent believing that
3  this oak tree here or whatever -- but we reaffirm
4  the lower court's ruling, the oak tree stays.
5       And if you have a problem with your
6  pipeline, you can cut it down.  But we're not here
7  to set a precedent.  We're here to judge this case
8  in front of us.  But the oak tree stays.
9       And my maple tree is not an oak tree.
10  It's a little Burgundy Lace red maple.  And I'll
11  be darned if I couldn't cut it down in 30 minutes.
12  Q   Have you talked with any contractors
13  regarding the removal of the three?
14  A   Yes, I have.
15  Q   Who have you spoken to?
16  A   I spoke with Grant Rewega who had done
17  some work for us.  I asked him to come out and
18  take a look at the tree.  And he stated that he
19  would probably -- depending on the size of the
20  crew, could probably remove the top part of that
21  tree in 30 minutes, and with a front end digger

Page 32

1  within the next hour or so have that thing dug up
2  and pulled to the side because remember, we've not
3  saving it for any transplanting.
4       Oh, and referencing the transplanting of
5  the tree, there's no way we would be allowed to do
6  that because they have a spade -- you would have
7  to have like an eight to ten-foot spade.  You know
8  what they are.
9  Q   Yes.
10  A   And in order to do that, they go down so
11  deep when those knifes go down.  You couldn't risk
12  that with the pipeline there.  So the tree would
13  be destroyed.  And I have no other place to plant
14  the tree even if I could move it.
15  Q   What company is Mr. Rewega with?
16  A   Terra Nova Landscaping.
17  Q   Where are they located?
18  A   Damascus, I think, but don't quote me on
19  that.
20  Q   Do you know whether they have been
21  involved in tree removal over a pipeline?

Page 33

1  A   Not to -- I have no knowledge of that.  I
2  would doubt it.  Most people don't go looking for
3  pipelines to cut trees over.
4  Q   Other than Mr. Rewega, have you talked to
5  anybody else about the removal of the tree from
6  the easement?
7  A   Yes.  With Kelly Lewis of Ruppert.
8  Q   What did will Louis tell you?
9  A   He told -- when you have a tree company
10  like that, they tend to be more conservative
11  because they try to save the tree.  And that's why
12  I think the SavATree people said they hated to cut
13  that because they're in the business of saving
14  trees.  But their contract is to cut down trees.
15       He stated that probably with a crew --
16  and he said that would depend on the size of the
17  crew.  He said in an emergency you would have more
18  of a crew than less of a crew.  You could do it
19  with two people if you weren't in a hurry.
20       But with three or four people I think he
21  estimated 45 minutes to totally remove the tree to

9 (Pages 30 - 33)

Page 34

1  make it like the rest of the right-of-way which is
2  just cut down to the ground and probably another
3  couple of hours to totally get the roots up, haul
4  it away, et cetera.
5      Q    Did he tell you how they would go about
6  removing the tree?
7      A    Chainsaws lopping off the front branches
8  so you can access then with your skimmer because
9  the roots are shallow.  You can just back up and
10  rip it out.
11     Q    When you say "skimmer," what are you
12  referring to there?
13     A    Do you know what a front end loader is?
14     Q    Yes.
15     A    That type of a machine, or backhoes.
16  They could use backhoes also.
17     Q    Do you know whether Mr. Lewis has any
18  experience in removing trees from a natural gas
19  pipeline easement?
20     A    I have no knowledge of that.  I didn't
21  ask that question.

Page 35

1      Q    Other than Mr. Lewis and Mr. Rewega, have
2  you talked to anyone else about removal of the
3  tree?
4      A    You mean like contracting to have it
5  done?  Get it out of there?
6      Q    Well, anybody in the --
7      A    In the business?
8      Q    Yes.
9      A    I don't believe I have.  I can't recall
10  anyone else.
11     Q    Now, you mentioned SavATree.  Did you
12  have discussions with them about the red maple
13  tree?
14     A    Yes.  Several occasions.  Are you taking
15  my tree today?  And they would say yes or no.
16     Q    Do you recall the names of any persons
17  from SavATree that you spoke to?
18     A    One guy's name was Vince.  I think he
19  might have been the supervisor or something.  Very
20  nice young man.
21     Q    What did Vince or anyone else from

Page 36

1  SavATree say to you with respect to the red maple
2  tree?
3      A    They didn't want to cut it, but they knew
4  they had to.  And they said, you know, if they
5  tell us to do it, they follow the orders.
6      Q    Did they say anything else to you?
7      A    It was just always around the tree and my
8  worrying about the tree, my hand wringing.  We
9  were stuck around there for several weeks.  We
10  would not leave the house.
11         And you heard Mr. Redd's own testimony.
12  Had no one been there or no one to stop him, he
13  would have gone in and cut the tree.  So we never
14  left the house for that period of time until the
15  agreement was struck that he would not cut the
16  tree.  We always had someone there.  My wife,
17  myself, or my son.
18     Q    Let's talk about Mr. Redd.  You've
19  already told me a couple of conversations you had
20  with him.  One about the farmers in Howard County.
21  Any other statements that Mr. Redd made to you

Page 37

1  regarding the reasons for the removal of the tree?
2      A    Yes.  At first it started out very
3  strongly that the root system of this tree could
4  get down, interfere with the cathodic protection.
5  Then it became stronger and stronger that we don't
6  have quick access to the tree in the event of an
7  emergency.
8          To me, that was just a gross
9  misrepresentation that has gone into the court as
10  well as to us because, number one, he knew what
11  the right-of-way said, and that he could get
12  access to that pipeline.
13         And he knew he could get there quicker
14  than if he went down just across my fence to my
15  neighbor's lot with all of these huge 160,
16  420-foot roots crisscrossing each other all across
17  that pipeline.  So the problem just across my
18  fence is going to be ten times worse than my tiny
19  little maple tree there, but he never said that.
20         And he had to know that.  He's been in
21  the business with Columbia what?  16 years or

10 (Pages 34 - 37)

Page 38

1  something like that. And you're telling me -- and
2  you're looking at me in the eye and telling me
3  that you had no knowledge of those Lombardy maples
4  and the sycamore trees and all these huge trees
5  that have these roots that go on forever? And yet
6  you're suing me over these tiny little roots? I
7  don't understand that.
8      Q   Do you know what's required for Columbia
9  to have quick access to the pipeline in the event
10  of an emergency?
11     A   I have no idea.
12     Q   Well, then how do you know that the tree
13  doesn't interfere with that access?
14     A   Because I know they're trying to make
15  this that it's a worse situation than -- because
16  once they cleared down the 50 foot through my
17  neighbor's woods, they were happy. And those
18  roots are 10 times worse than the roots of that
19  maple tree.
20         So that makes this totally a bogus claim
21  that this tree is the big boogeyman in that

Page 39

1  right-of-way. It's simple -- it's common sense.
2  You have common sense. If you weren't working for
3  them, you would be on my side because that maple
4  tree isn't a fraction of the root systems of those
5  huge trees that crisscross that pipeline all the
6  way down through the woods.
7      Q   Have those trees been removed?
8      A   No. They're still standing there. And
9  all those roots are crisscrossing that pipeline.
10  They didn't do root pruning and dig up roots.
11     Q   So going back to my question. Other than
12  you pointing to trees on other properties, why do
13  you think that your tree doesn't impede quick
14  access to the pipeline if there is an emergency?
15     A   Because it can be easily dug up with
16  their front end digger and backed up and dropped
17  over there.
18     Q   So if there is an emergency, you believe
19  you can use a front end loader to dig up and
20  around a natural gas pipeline?
21     A   It won't cause sparks any more than a

Page 40

1  pickaxe and a shovel unless they --
2      Q   How do you know that?
3      A   Because I grew up on a farm. And you can
4  have sparks fly from a pickaxe and a shovel.
5  Trust me. Did you ever work on a farm? Did you
6  ever dig lots of dirt? Do it at night. Practice
7  tonight yourself.
8      Q   I'm asking the questions. We can talk
9  afterwards about our farming experience.
10     A   Okay.
11     Q   So did you ever ask anyone whether in an
12  emergency situation, say, when there's a gas leak
13  whether you can use a front end loader to remove
14  the tree?
15     A   No.
16     Q   Do you know whether there is restrictions
17  on the ability of Columbia to use that kind of
18  machinery if there's a leak?
19     A   No. They never told me there was a
20  restriction. If you're moving that mass amount of
21  dirt, I would dare venture that they take their

Page 41

1  front end loader. They cut the line -- if there
2  is a major leak, they cut the -- they turn off the
3  line. They blow the gas. Let it dissipate and
4  then they do their quick repair and then recharge
5  their line.
6      Q   Do you know how many people get their
7  natural gas from that pipeline?
8      A   I would imagine thousands and thousands.
9      Q   So you would suggest they cut off the
10  natural gas to all of those people in order to do
11  their repair?
12     A   By the same token you're suggesting to me
13  that they dig around that thing with gas flying
14  out of there? I don't -- that's hard to believe,
15  but if they say they do, more power to them. I
16  wouldn't go down there.
17     Q   Well, perhaps they don't use a front end
18  loader.
19     A   What do you use?
20     Q   Well, that's my question to you. You're
21  saying that the access -- you said it's a fraud on

11 (Pages 38 - 41)

Page 42

1  the court.  My question to you is, if there's a
2  gas leak, how is Columbia required to access that
3  pipeline?  Do you know?
4      A   They would access that pipeline, Mr.
5  Dingman, the identical way they would access it
6  just across my fence in my neighbor's 50-foot
7  right-of-way through the woods.
8          They would use whatever techniques they
9  use -- they're the professionals -- to go down
10  through that quagmire of roots crisscrossing each
11  other ten times worse than my red maple.
12          I contend it would take them longer to
13  get to the line across my fence than it would
14  where my red maple sits because the top part is a
15  piece of cake.  And the rest of it is a 24-inch
16  root system that can be skimmed off of the top.
17      Q   But we're talking about your tree.
18      A   That's what I'm talking about.  My tree.
19  But you're suing me based on the fact that if you
20  remove my tree, then everything is copacetic
21  through the pipeline here now because we're all

Page 43

1  clear.  And the rest of the pipeline -- we have
2  easy access to the pipeline.  But you don't.  You
3  have all those roots from those huge trees over
4  there.
5      Q   Mr. Haas, if there was a gas leak 25 feet
6  from your house, wouldn't you want Columbia to
7  access the pipeline and fix that leak as quickly
8  as possible?
9      A   Absolutely.
10      Q   So how much delay do you think would
11  incur as a result of your tree within two feet of
12  the pipeline?
13      A   What do you mean how much delay?
14      Q   How much of a delay -- how much gas would
15  continue to leak why they deal with your tree?
16      A   It depends on how long they don't cut the
17  gas line.
18      Q   So your suggestion is leave your tree and
19  cut off the gas to the thousands of people and
20  businesses who need it?  Is that your position?
21      A   Do you know what?  I'm uneducated as to

Page 44

1  exactly how they do that.  I would like to know --
2  and, in fact, I'll try to do some research, I
3  assure you, on how they repair a gas pipeline -- a
4  high pressured gas line leaving -- with a leak and
5  leaving the gas pressure up.  I would like to read
6  how they do that because that would be kind of
7  cool to know.
8      Q   Well, my question to you is, if there is
9  a leak in this location 25 feet from your house,
10  you would want Columbia to be able to access that
11  pipeline --
12      A   As quickly as possible.
13      Q   -- and fix the leak, right?
14      A   As quickly as possible.  Absolutely.
15      Q   The tree would delay that access,
16  wouldn't it?
17      A   No because it's not delaying it as much
18  as the one next door to me.
19      Q   Well, let's not worry about the
20  neighbors.  I'm talking about --
21      A   But that is pertinent --

Page 45

1      Q   -- your tree.
2      A   -- but that is pertinent, Mr. Dingman, to
3  this tree.
4      Q   If your tree --
5      A   You're trying to divorce that pipeline
6  all the way through the neighborhood from my one
7  tree location.  The rest of my yard is all mowed
8  grass and a couple of little nandina that grow
9  like this like grass and then a couple of azaleas
10  that are like three feet tall and my lilac bush.
11  The rest is all -- I mow it for them.  It's easy
12  access.
13          They use the same identical bulldoze, or
14  whatever equipment they use, to dig my grass as
15  they would my tree.  The difference is lopping the
16  branches on the tree, scooping the tree, setting
17  it aside, and they're as they were anywhere in
18  that pipeline, only better off because I don't
19  have that all those woods trees crisscrossing.
20      Q   What amount of delay would be acceptable
21  to you if there was a gas leak 25 feet from your

12 (Pages 42 - 45)

Page 46

1  house for Columbia to get to the pipeline?
2      A    Three seconds.
3      Q    Removing that tree would delay access
4  more than three seconds, wouldn't it?
5      A    It would delay it no more than the trees
6  that line that pipeline that --
7      Q    We're not talking about those trees.
8  We're talking --
9      A    We have to compare --
10     Q    -- about your tree.
11     A    -- we have to compare the level of access
12  to the entire pipeline if you're going to focus on
13  my tree. Is that not fair?
14     Q    We're focusing on your tree because
15  that's what's at issue in this case.
16     A    But it has to be if you remove my tree,
17  you can get to that pipeline faster than you could
18  just across my fence. That's the focus of this
19  lawsuit.
20     Q    Would you agree that if there is a leak
21  at the pipeline where the tree is located, that

Page 47

1  Columbia could access it faster if the tree was
2  not there?
3      A    No because they would have to dig through
4  the same roots -- worst roots next door. And the
5  20 minutes or --
6      Q    That's not an answer to my question. I'm
7  asking you --
8      A    That is an answer to --
9      Q    -- about --
10     A    I just --
11     Q    Please.
12     A    Go ahead.
13     Q    I'm asking you about your tree, not your
14  neighbor's tree. You agree that the tree delays
15  access to the pipeline, right?
16     A    No more than my neighbor's where they
17  cleared it.
18     Q    Can you answer the question. You agree
19  that --
20     A    Yes.
21     Q    The answer is yes?

Page 48

1      A    Yes. A qualified yes.
2      Q    So if there is a leak at this location 25
3  feet from your house, you would want Columbia to
4  access that pipeline and fix the leak as soon as
5  possible, right?
6      A    That's correct.
7      Q    And you agree that the tree being at the
8  location it is within two feet of the pipeline
9  would delay that access, correct?
10     A    No. I do not agree because they would
11  have --
12     Q    How can you not agree with that?
13     A    Because it would be the same next door
14  and up --
15     Q    Mr. Haas --
16     A    -- this way and that way.
17     Q    -- I'm asking about your tree.
18     A    I'm talking about my tree. No, it would
19  not delay it any more than anyplace else on the
20  pipeline.
21     Q    But it would delay it, correct? It would

Page 49

1  delay access --
2      A    Then dirt delays access, Mr. Dingman.
3      Q    Mr. Haas, it's a yes-or-no question.
4      A    No, it's not. It's a qualified question.
5  It is, yes, it would delay it the same as all the
6  other crisscrossed roots across the pipeline that
7  exists up and down that neighborhood. In fact,
8  they could get in there faster in my opinion.
9      Q    All right. Have you had discussions with
10  anyone regarding the safety requirements working
11  in and around an operating natural gas pipeline?
12     A    I'm sure they've been referenced by
13  people -- you know, Antonio or Karen Stevenson,
14  I'm sure they may have referenced some of that
15  stuff. The other thing they kept telling us the
16  minimum guidelines -- in fact, in his letter -- I
17  have the letter right here.
18          In 2010 he sent a letter out saying that
19  they would be doing a close interval survey. And
20  he also mentioned that they would be doing the
21  removal of bushes, scrubs, vegetation that does

13 (Pages 46 - 49)

Page 50

1  not conform to Columbia minimum guidelines for
2  construction. Have you heard of the minimum
3  guidelines?
4    Q   Yes.
5    A   Okay. And then he went on to talk about
6  what they had to do. Couldn't be any taller than
7  five feet tall, blah, blah, blah. I read those
8  guidelines later on. That was in 2010. By the
9  way, they did not cut my tree in 2010.
10       As I recall, to the best of my
11  recollection, when these men came through --
12  because I had gotten this letter, I saw people --
13  and that's when they did the interval survey when
14  they ran the wire, et cetera, on the line.
15       They were not going to -- he said,
16  Mr. Haas, we're not touching your tree. We're not
17  touching anything, because I was wringing hands,
18  getting ready to fight and preserve my property.
19  He said, We're not touching anything here.
20       And they went on with their tests. And
21  to my knowledge it was completed successfully

Page 51

1  because no one came knocking on my door or sent me
2  a letter or had a phone call saying that you
3  screwed up our close interval test. And so we
4  can't do that.
5       I've never had a call saying, The pig
6  didn't go through because your tree was there. So
7  I don't see any -- by the way, at the end of that
8  letter he included a copy of the minimum
9  guidelines. And lo and behold, when I checked
10  back there after I read the current minimum
11  guidelines dated July 2015, I referenced his
12  minimum guidelines dated May 2010.
13       And it states, These guidelines supercede
14  any and all prior guidelines pertaining to
15  activities and placements on or near gas
16  transmission facilities owned by the NGTS Company.
17  Existence of or the ramifications from the
18  implementation -- I'm sorry. Maybe I'm not at the
19  end of it.
20       Oh, here it is. At the very end it says,
21  In the event that the provisions of an applicable

Page 52

1  land rights document, my right-of-way, conflict
2  with the requirements set forth herein, the land
3  rights document shall supercede these
4  requirements. Karen Stevenson sent it in the
5  letter she sent me in April included in the fourth
6  paragraph of her letter and the minimum guidelines
7  that they're enforcing on us.
8       It says, Columbia's minimum guidelines
9  for activities or construction attached to this
10  letter prohibits trees within any right-of-way or
11  easement.
12       They kept shoving this thing down my
13  throat knowing full well -- and they filed this
14  suit knowing full well that those minimum
15  guidelines are superceded by our right-of-way
16  agreement. And our --
17    Q   Let me ask you this question --
18    A   -- right-of-way -- wait a minute. I'm --
19    Q   Mr. Haas, I've let you talk for like five
20  minutes. So let me ask a question. Why do you
21  say the minimum guidelines conflict with the

Page 53

1  right-of-way agreement?
2    A   Because they put stuff in there that's
3  not in the right-of-way agreement. That's why the
4  right -- that's why the guideline says the
5  right-of-way agreements -- they knew there would
6  be conflict with the guidelines or they wouldn't
7  have put that my right-of-way superceded those
8  guidelines.
9       You're a lawyer. If something supercedes
10  something else, then that something else is over
11  here.
12    Q   Well, you agreed -- and you have
13  testified to this already -- that your rights are
14  subject to Columbia's right to maintain and
15  operate the pipeline, correct?
16    A   Below cultivation as required by the
17  right-of-way agreement.
18    Q   So what's your basis for saying that
19  those minimum guidelines do not protect Columbia's
20  right to maintain and operate its pipeline?
21    A   I never did.

14 (Pages 50 - 53)

Page 54

1    Q   Okay.  Well, then --
2    A   You just said that.  I didn't.
3    Q   Then how are the minimum guidelines
4  inconsistent with the right-of-way agreement?
5    A   Because they required me to do things
6  that aren't in the right-of-way agreement.  And
7  that's why --
8    Q   Let me --
9    A   -- why did they put --
10   Q   -- stop -- let me stop you --
11   A   -- why did they put --
12   Q   -- there, Mr. Haas.
13   A   -- why did they --
14   Q   Mr. Haas, please, I'm trying to get a
15  clear answer from you.  Why are the minimum
16  guidelines in conflict with the right-of-way
17  agreement when you've already testified that the
18  right-of-way does limit what you can do in the
19  easement?  So please tell me precisely why the
20  minimum guidelines are in conflict with the
21  right-of-way agreement.

Page 55

1    A   If you go back and check my statement, I
2  said they -- you cannot do anything that is
3  absurd, as the judge said, when interpreting the
4  right-of-way agreement.
5        He wouldn't reimburse the gentlemen for
6  their fence, unless they had a broken fence or
7  some other crop, he said, because it's not --
8  everything else is not specified in the
9  right-of-way agreement.  So if it's not in the
10  right-of-way agreement, you're not bound by it.
11   Q   So then you could do anything you wanted
12  in that easement?
13   A   I already clarified that, Mr. Dingman.  I
14  told you --
15   Q   And that's my --
16   A   -- that if it's absurd --
17   Q   -- point, Mr. Haas.
18   A   -- if it's absurd.  I can't build a shed.
19  I can't build a pool.
20   Q   Right.
21   A   But I can plant peach trees.  I can

Page 56

1  plant --
2    Q   So those parts of the minimum guidelines
3  are not in conflict with the right-of-way
4  agreement?
5    A   What part?
6    Q   That say you can't have a shed or a
7  fence.
8    A   No.  I never said that.
9    Q   Okay.  So at least part of the minimum
10  guidelines, you would agree, do not conflict with
11  the --
12   A   But the --
13   Q   -- right-of-way agreement?
14   A   -- but the original right-of-way
15  agreement --
16   Q   Mr. Haas, please, I need you to answer my
17  question and not argue with me.
18   A   The guidelines do not in any way apply to
19  my wife and myself in regards to our right-of-way
20  agreement.  If you could go back and rewrite --
21   Q   Please tell me --

Page 57

1    A   -- my contracts, I would --
2    Q   Let me ask you a question.
3    A   -- love to do that.
4    Q   Let me ask you -- this is what I'm trying
5  to get you to focus on and stop arguing with me.
6  You've already testified that there are reasonable
7  limitations to what you can do in the easement,
8  correct?
9    A   That's correct.
10   Q   Okay.  Tell me what in the minimum
11  guidelines are not reasonable restrictions on what
12  you can do in the easement.
13   A   Telling me I have to plant ivy or pansies
14  or nothing for a ten-feet strip through my
15  landscaping that now exists, that is unreasonable.
16   Q   Why?
17   A   Because it's not allowed under my
18  right-of-way agreement.
19   Q   But that's not the issue.  You've
20  already --
21   A   It is the issue.  You just told me --

15 (Pages 54 - 57)

Page 58

1    Q   Mr. Haas, stop, please.
2    A   -- the guidelines apply. And I'm --
3    Q   You've --
4    A   -- telling you why they don't apply.
5    Q   You've testified repeatedly that even
6    though there's not written restrictions in the
7    right-of-way agreement, there are reasonable
8    limitations on what you can do in the easement.
9    A   And I qualified those as being absurd.
10   Any absurd item that you --
11   Q   So tell me what in the minimum guidelines
12   you believe are absurd such that they're not
13   applicable to the right-of-way agreement.
14   A   For the fourth time, planting grass where
15   I now have my beautiful landscaping, planting ivy
16   or pansies where Antonio Redd said they're
17   planting six- and eight-foot corn with six-foot
18   roots. That's what I'm talking about.
19   Q   What else in the minimum guidelines do
20   you think are not reasonable restrictions?
21   A   I don't know. I would have to go through

Page 59

1    and pick them apart. Not planting -- I seem to
2    recall things we weren't supposed to plant within
3    so much of a valve assembly or distribution point
4    or something. That's not at my house.
5        I stood right there by that tree with
6    Francis Stone, one of your engineers. I asked,
7    Francis, you know this really upsets me.
8        He said, I know.
9        Do you know Francis Stone?
10   Q   He'll be here later today.
11   A   Do you know him?
12       MR. ROST: Don't ask him questions. Just
13   answer his questions.
14       THE WITNESS: I asked Francis Stone, I
15   said, With no pipe junctures here and with no
16   valves sticking out of the ground, no stations
17   here, what are the odds of anything happening here
18   where I have my tree? What are the percentages?
19       He said, Zero percent. But he said,
20   They're going to ask you to get that tree out of
21   there anyway.

Page 60

1    BY MR. DINGMAN:
2    Q   Would it surprise you if he will testify
3    later on he never said that?
4    A   Look me in the eye. Have I ever met
5    anybody who ever told a lie?
6    Q   I don't know, Mr. Haas. I'm asking
7    you --
8    A   I have in four previous suits and none of
9    them won.
10   Q   Let's go back to your conversations with
11   Tony Redd. We're going to focus on the 2017 time
12   frame. Other than the statements you've already
13   testified to, what else, if anything, did he say
14   about the removal of the red maple tree?
15   A   Well, on the day he was there it -- it
16   got rather intense. And they just kept -- in
17   fact, I felt like my head was going to explode.
18   Kind of like a couple times here this morning.
19   They just kept saying, We are going to cut down
20   your tree.
21       And I said, Look me in my eye. You will

Page 61

1    not touch the tree.
2        He said, Mr. Haas, your tree will come
3    down.
4        It was like a couple of three years old
5    saying, No, you didn't. Yes, you did. No, you
6    didn't. Yes, you did. It was really getting
7    ridiculous.
8        Finally they said, Well, let's go out and
9    take a look, after about, I would say, 20 or 30
10   minutes there in the kitchen. When they walked
11   out there, I just stayed sitting at the table.
12   Like I said, I felt like my head was going to
13   explode.
14       Where I had my tree they told me I could
15   plant ivy, pansies or grass if I prefer. And my
16   wife did follow them out. When they got down
17   there, I later joined them. And she told you some
18   of the conversations she had. When I came around
19   the red maple tree, they were just talking about,
20   And your lilac and nandina and your azaleas will
21   all have to be cut to the ground.

16 (Pages 58 - 61)

Page 62

1    And I said, Over my dead body.

2    Mr. Redd said, Mr. Haas, these things
3  have to go.  We'll be here to cut this tree next
4  Monday or Tuesday.

5    I said, Look me straight in the eye.  You
6  will not be cutting anything next Monday or
7  Tuesday.

8    He said, We will cut the tree Monday or
9  Tuesday.  And we wrapped up things soon after
10  that.

11   Q    This is the meeting that took place --

12   A    24th.

13   Q    -- on March 24th?

14   A    At our house.

15   Q    That was with Karen Stevenson, Tony

16  Redd --

17   A    And Cheryl Thrift.

18   Q    -- and Cheryl Thrift?

19   A    And, again, outside they kept saying, We
20  want to be good neighbors.  We want to be good
21  neighbors.  We're reclaiming the right-of-way.

Page 63

1    I said, Why do you have to reclaim the
2  right-of-way?  We have a written document that
3  says you have a right-of-way.

4    But they kept saying reclaiming the
5  right-of-way.  But I did explain to him I owned
6  the property.  I said, As strange as that sounds,
7  you have a right to maintain your line below
8  ground level, below cultivation and whatever that
9  takes, but you don't have a right to destroy my
10  property.

11   Q    Other than this meeting on March 24th,
12  2017, did you have any other conversations with
13  Karen Stevenson?

14   A    On the telephone prior to her coming, I
15  had a conversation explaining the situation to
16  her.  And she said, Well, Mr. Haas, we're doing a
17  clearing of the right-of-way.  We're taking
18  everything.  She said, Your tree will have to come
19  down.

20    We must have spoken, I'm guessing, for
21  ten minutes or so.  I said, Ms. Stevenson, I need

Page 64

1  you to come to my house and look to see what this
2  will do to my home and my property.  I said,
3  That's an integral part of it.  It's a key part of
4  my landscaping scene.  I said, It will just
5  destroy it.

6    She said, I'm sorry.  We just can't do
7  that.

8    And I pressed and pressed and pressed.  I
9  said, You can't do such destruction without coming
10  out and seeing for yourself what this will do to
11  our house and our landscaping.

12    And she -- as I recall, to the best of my
13  recollection, she had a trip to Texas or
14  something.  Do they own Texas pipeline, if you
15  know?  I don't know.

16   Q    They own a lot of pipelines.

17   A    Okay.  She said, I have a trip to Texas.
18  Maybe I can swing by there on Friday on my way
19  back.  So that's what they did.  And she brought
20  Antonio Redd and Cheryl Thrift with her.

21   Q    So at this meeting that took place on

Page 65

1  March 24th, do you recall any statements she made
2  about the pipeline and the need to remove the
3  tree?

4    A    Absolutely.  She said, The tree must be
5  removed.

6    And as my wife stated earlier, I said,
7  But when I was on the phone with you, you told me
8  you had checked with your arborist.  I think you
9  said you had one inside and one outside of the
10  company that you checked with, and they all
11  confirmed that they're noninvasive roots.

12    And she said, That's correct, but the
13  tree has to be cut down.

14    They're trying to set a precedent.
15  They're trying to show my neighbors that you don't
16  screw around with this multibillion dollar plus
17  plus company and that no one can question them.
18  They don't want to have one tree standing and
19  another neighbor say, What's their tree doing
20  there?  My tree is gone.

21    And my neighbor had a beautiful pink

17 (Pages 62 - 65)

1  dogwood taken out when there was no need to take
2  that tree. It was doing no damage to anybody, and
3  two big beautiful Kwanzan cherry trees. And later
4  on I was telling her what happened. She said, We
5  couldn't have afforded to fight them.
6       And that's what you all depend on. Just
7  crushing these little guys like a gnat because
8  they can't afford to maintain the lawsuit.
9   Q   Or maybe they're just really interested
10  in maintaining a safe pipeline.
11   A   No. Actually, that wasn't the case
12  because I know --
13   Q   And you know that why?
14   A   Because the tree --
15   Q   Why are all these people out to get you,
16  Mr. Haas?
17       MR. ROST: Let him answer the --
18       THE WITNESS: All of the people? What
19  people, Mr. Dingman? What's on your list of
20  people that are out to get me?
21  BY MR. DINGMAN:

1   Q   Well, you said pretty much everyone you
2  talked to at Columbia is a liar and committing
3  fraud, and they're not doing this for any reasons
4  relating to the safety of their pipeline. I would
5  like to know, since you're accusing all these
6  people of acting improperly, what do you know
7  about what's necessary to maintain a safe
8  pipeline?
9   A   I'll tell you this --
10   Q   No. Answer my question. What --
11   A   I just said --
12   Q   -- do you know --
13   A   -- "I'll tell you this."
14   Q   -- what do you --
15       MR. ROST: Let him answer --
16  BY MR. DINGMAN:
17   Q   -- know about operating a safe --
18   A   Why are you being --
19       MR. ROST: Hey, let --
20  BY MR. DINGMAN:
21   Q   -- pipeline?

1   A   -- so hostile to me? I said --
2   Q   I'm not being hostile to you. You're
3  making --
4   A   You just said, Tell me. And I said, I'll
5  tell you this. And then you interrupted me.
6   Q   -- you're making accusations that people
7  are lying, that you're being bullied. And I would
8  like to know what you know about what's necessary
9  to maintain the safety of a natural gas pipeline
10  that substantiates what you're saying under oath?
11   A   I don't know the inner workings of your
12  pipeline company any more than you can run a
13  nursing home for three seconds.
14   Q   Then why are you accusing people of
15  acting improperly?
16   A   Because the facts that they're
17  representing to me are not true. They're
18  saying --
19   Q   What facts?
20   A   I just went over this ten times and you
21  kept attacking me. All of those huge 160-foot --

1   Q   Let me just state for the record, I have
2  not been attacking you. And that's --
3   A   You just did it again. I was trying --
4   Q   -- an improper statement. I've let you
5  actually argue for probably half of this
6  deposition without interrupting you. But my
7  question is very specific. You're making serious
8  accusations --
9   A   Yes.
10   Q   -- on the record --
11   A   On the record.
12   Q   -- that people are lying to you --
13   A   Misrepresenting.
14   Q   -- and misrepresenting to you why they
15  need to remove your tree. So I --
16   A   Yes.
17   Q   -- would like to know what your knowledge
18  is of about what is required to safely operate and
19  maintain a natural gas transmission line.
20   A   All right. Let me answer your question.
21   Q   I'd be happy to hear it.

18 (Pages 66 - 69)

Page 70

1    A    The reason they're misrepresenting the
2   facts that if my tree were the big boogyman that
3   you represented and they're representing through
4   you to me, then they would have to go down and
5   root prune every tree through their 50-foot
6   pipeline right-of-way coming from these trees that
7   are mega times bigger than my red maple. And
8   those roots crisscross.
9        Don't take my word for it. Go to your
10  computer. A fifth grader could do it. Call Iowa
11  State University. Look how deep the roots grow.
12  Look up the root spread of the American elm. Look
13  up the root spread of the sycamore tree. 160 to
14  420 feet.
15       And you're telling me with a straight
16  face that these people have not misrepresented the
17  comparative safety of my maple tree to what they
18  know goes down that pipeline? I'm sorry. I'm not
19  buying it.
20   Q    How many trees were removed by Columbia
21  in your neighborhood?

Page 71

1    A    A lot of them.
2    Q    A lot of them?
3    A    Yeah.
4    Q    So they are taking action on adjacent
5   properties, right?
6    A    Oh, absolutely. And I just said the
7   trees --
8    Q    So why --
9    A    -- that they just cleared, all those
10  roots from the trees that left -- that are left
11  standing on the sides are still growing and
12  crisscrossing across those pipelines like there is
13  no tomorrow. Yet, they're making out like my
14  maple tree is the boogeyman.
15   Q    So my question is, why do you believe
16  then, since they've removed these other trees,
17  that they're acting fraudulently and improperly in
18  trying to remove your tree along with all the
19  others they took out of the neighborhood?
20   A    Because the trees that were taken out I'm
21  watching in -- I don't think they should have

Page 72

1   taken some of the trees in my neighbor's lot.
2    Q    Why do you say that?
3    A    Because I don't think they're a threat to
4   the pipeline. That's my opinion.
5    Q    I understand that's your opinion, but I'm
6   asking you -- you're making accusations that
7   there's no basis for any of this and you're saying
8   it's my opinion. My question for you is, what is
9   that opinion based on?
10   A    The opinion is based on the fact that
11  those tree roots that are all over that pipeline
12  make mine small by comparison. You could not boil
13  this case down to being any simpler than that.
14       The massive tree roots that cover that
15  pipeline from both sides of the remaining trees
16  are so huge, they make mine look like a tiny
17  cupcake compared to a wedding cake by comparison.
18  And to dig down to my maple tree is going to be a
19  fraction of the time it will take them to get
20  through if a leak happens 50 feet that way.
21   Q    So getting back to this meeting on March

Page 73

1   24th, 2017. Other than what you've testified to,
2   did Karen Stevenson say anything else to you
3   regarding the removal of the red maple tree?
4    A    No. In essence, it's gone. We will take
5   the red maple tree.
6    Q    And Cheryl Thrift was also at this
7   meeting; is that correct?
8    A    That's correct.
9    Q    Do you recall any statements she made
10  about the removal of the tree?
11   A    Yes. It should go. She was also -- you
12  know, in a conversation one person doesn't keep
13  talking. The other one -- when we were down below
14  the red maple tree, they were all in concert
15  saying, yeah, the azaleas have to go. Then
16  another one, yeah, we have to clear that. The
17  lilac has to go. So then all of this will be
18  gone.
19   Q    Anything else that you recall Ms. Thrift
20  saying during this meeting?
21   A    No. Primarily that she concurred with

19 (Pages 70 - 73)

Page 74

1  the noninvasive roots of the Burgundy Lace maple,
2  and that was not a part of her consideration.
3    Q   Did you have any other conversations with
4  her other than what happened at this meeting on
5  March 24th?
6    A   I do not recall.  The next communication
7  I had from her was this letter threatening to sue
8  us.  After we would allow them to cut the tree
9  down, we would sign a confidentiality agreement,
10  which I found, in spite of all of the trauma of
11  this and the stress, rather amusing that we would
12  sign a confidentiality agreement to discuss
13  anything with them after they cut our tree down.
14      And they had made promises over and over.
15  You get someone in here.  You know, we'll take
16  care of things.  You get someone in here and draw
17  up a plan and all this.  Of course, that's us
18  funding the money once again.
19      And talking about damages, I said,
20  Besides, we're going to have damages.
21      They said, There's no damages.  We're

Page 75

1  just maintaining our pipeline.
2      I said, But my right-of-way agreement --
3  I don't know what their definition of the word
4  "any" is, but my agreement states that if there's
5  any damages, that they would fully reimburse as a
6  result of their maintenance of the pipeline.
7      But they said, No.  That's not true.  No
8  damages.
9      So you see, they just pick and choose
10  anything they want.  Insert stuff that's not there
11  like how -- I've gone over this thing 100 times.
12  I can't find that ten-foot width over top of the
13  pipeline where we can plant nothing.  And I can't
14  find where -- the other stuff is to grow just
15  five-feet tall.
16    Q   And you can't find anything that says
17  don't build a house on the pipeline.  You can't
18  find anything that says don't --
19    A   Going back to the --
20    Q   -- build a shed on the pipeline.
21    A   -- judge's interpretation to the absurd.

Page 76

1    Q   But that doesn't mean those restrictions
2  do not apply, right?
3    A   So then I don't have a right-of-way.
4  This thing is worth nothing.
5    Q   You mentioned that you had at least one
6  conversation with Francis Stone.  So let's go back
7  to that.
8    A   Yes.
9    Q   On how many occasions did you either meet
10  with or talk to Mr. Stone?
11    A   On one occasion he came out when they had
12  to rerun a TV cable.  And they said -- he said, I
13  have to be here when they put the 70-foot conduit.
14    Q   This is running cable to your house?
15    A   Yes.  And that was, I'm guessing, three
16  months before that.  Again, that's guessing.
17    Q   Was that approximately September of 2016?
18    A   Your guess is as good as mine.
19    Q   We looked at one call ticket at the prior
20  deposition.
21    A   Oh, okay.

Page 77

1    Q   So he was out on that occasion, whenever
2  the date might be.
3    A   Right.  I think the cable company is
4  required to call and everything.
5    Q   So did you have a conversation with him
6  at that time regarding the tree?
7    A   No.  He told me -- he was just standing
8  there waiting, killing time.  And he looked and he
9  said, You know what.  I'll bet you that tree down
10  there is going to have to go.  And he pointed to
11  the neighbor's cherry tree and he said, I'll bet
12  that one will have to go.  And I'll bet you that
13  one might have to go.
14    Q   Did he point to your tree?
15    A   Yeah.  I said that was the first one he
16  pointed to, because he was standing there, you
17  know, just walking around and looking at the
18  pipeline up and down.
19    Q   Was that the first time you met him?
20    A   To my knowledge it is.  He could have
21  been --

20 (Pages 74 - 77)

Page 78

1    Q   When was the next time you had a meeting
2  or a conversation with Mr. Stone?
3    A   He stopped by different times, you know,
4  I guess, looking at the progress of it. Then that
5  one day when we stood by the tree there, of course
6  I remember that.
7    Q   Do you recall when that was?
8    A   I don't. And I don't --
9    Q   Was it before or after the meeting on
10 March 24th that we talked about?
11   A   I think it was before.
12   Q   So he was out there --
13   A   Just checking stuff.
14   Q   Okay. What did you discuss with him at
15 that time?
16   A   My tree and the progress of the -- you
17 know, the general progress of the clearing and...
18   Q   What, if anything, did he say to you
19 during that conversation about --
20   A   I've already stated that. I thought I
21 already answered that.

Page 79

1    Q   Can you answer it again? I just want to
2  be sure that --
3    A   Yes. We were standing --
4    Q   -- this is the --
5    A   -- by the tree. I said, Francis,
6  seriously. I said, With no pipe junctions, with
7  no valves here, what are the odds -- what are the
8  percentages of anything happening here at this
9  tree?
10        And he said, Zero percentage.
11   Q   At any time did he ever show you pictures
12 or photographs of tree roots around the pipeline?
13   A   Antonio Redd did a good job of that.
14   Q   Did Mr. Stone show any of those pictures?
15   A   No. Antonio Redd had a prepared album.
16   Q   After this meeting that you were just
17 talking about with Mr. Stone, did you meet or talk
18 with him again?
19   A   I'm sure, as time went on, he -- I may
20 have seen him coming and -- but I know of no -- I
21 can't recall any other incidents.

Page 80

1    Q   So he wasn't at the March 24th meeting
2  that we've talked about?
3    A   Definitely not.
4        MR. DINGMAN: Why don't we take a quick
5  break so I can organize this.
6        (A recess was taken from 12:34 to 12:45
7  p.m.)
8  BY MR. DINGMAN:
9    Q   All right. Mr. Haas, I want to ask you
10 about the planting of the tree. I think we've
11 already established it was planted in July of
12 1976, correct?
13   A   That sounds correct.
14   Q   Were you actually involved, or did you
15 observe the planting of the tree at that time?
16   A   To the best of my recollection I did
17 because whenever anything like that goes on, I'm
18 there to see that it's set right and, you know,
19 that it turns out the way we want it.
20   Q   The tree was installed -- again, this is,
21 I don't think, disputed by --

Page 81

1    A   Correct.
2    Q   -- Garden Gate, correct?
3    A   That's correct.
4    Q   Okay. Can you just explain to me, based
5  on your observation, how they went about planting
6  the tree at that time?
7    A   As I recall, the dirt where we had --
8  where you see that big circle come out, if you --
9  if you look at the picture closely, I'm sure you
10 can see it. But the dirt comes out and then kind
11 of comes up to the tree. Let me take a look at
12 that and see if it shows that at all.
13   Q   Just for the record, you're referring to
14 Exhibit 6.
15   A   See this here? This is where I'm talking
16 about the drop off from the dirt from the
17 foundation is up here. Then it was feathered out
18 down over this way and down toward my neighbor's
19 house that way and --
20   Q   For the record you're pointing at the
21 first picture of Exhibit 6.

21 (Pages 78 - 81)

Page 82

1    A    Yes.  If you look very carefully at the
2    base of the maple tree, you can see where the
3    roots start going out.  And that's where the dirt
4    was mounded up -- let me see if another picture
5    shows it from the -- now, this would show it.  I
6    can see it, but you wouldn't.  Here you can see a
7    little bit of it on Exhibit --
8    Q    This is Exhibit 6.  Are you looking at
9    the fourth photograph or the third --
10    A    Yeah.
11    Q    All right.  So the third photograph of
12    Exhibit 6.
13    A    If you look very carefully on this one, I
14    think you can see right here where it starts
15    mounding up right here and comes up to the tree.
16    And this is the dirt that was feathered out from
17    the basement.
18         If you go down here, this is a full
19    story.  From here down to here is a full story as
20    it goes along this side of the house.  This side
21    of this wing.  So the dirt was all bulldozed up

Page 83

1    and then feathered out.  This is a full basement
2    under the thing.  That's a lot of dirt.
3         So they pushed it all up and then
4    feathered it out this way and this way to make
5    that gentle little knoll up to the house.  So we
6    believed -- and I offered, in fact, when Mr. Redd
7    came out with his friend -- what was his name?
8    Mr. Fishell or whatever his name was at that time
9    prior to the attempt to take the tree.
10         And I walked them both over to the base
11    of the tree.  And I said, There's no need to take
12    my word for this.  I said, You must have a way --
13    now I know there is because I heard the engineer
14    talk about that machine where they can go, "bltt,
15    bltt, bltt".  You know, blow air down into the
16    thing and find out how deep the pipe actually is.
17         I said, You -- I offered to you -- I
18    said, Dig down and find out where the pipe is.
19    See if it's two and a half feet or if it's seven
20    feet from below my tree.
21         He said, Mr. Haas, look.  We're not going

Page 84

1    to bother with it.  We're taking your tree.  We're
2    going to cut your tree.  So that was the end of
3    that.
4    Q    Let's go back to the planting of the tree
5    and the question I had asked before which is, can
6    you explain how -- if you observed it, how the
7    tree was actually planted?
8    A    I can't give you the -- that would be
9    unfair to pretend.  I know how they do it.
10    Q    That's fine.  If you can't answer, that's
11    fine.
12    A    I couldn't tell precisely how they do it.
13    Generally when I've had anything like that
14    planted, they like to have it -- instead of the
15    shrub down in the dirt -- because if too much
16    moistures collects, the roots rot and you have a
17    dead plant.
18         So what they'll do is raise it up so that
19    like -- typically half of the root ball is
20    below -- that's the hole.  They dig a hole to
21    accommodate roughly half of the root ball or maybe

Page 85

1    a little more.  Then they mound the dirt up to
2    that.
3    Q    So my understanding --
4    A    And then make the bed appropriately, you
5    know, more -- make it so it feathers out nicely
6    and put mulch on.
7    Q    That's your understanding of how they
8    would typically do it, but you don't know what
9    they actually did when they --
10    A    Absolutely not.
11    Q    -- planted this tree?
12    A    I could never attest to that.
13    Q    Did anyone, either you or Garden Gate,
14    attempt to contact the gas company at that time
15    regarding the planting of the --
16    A    I did not.
17    Q    -- tree?
18    A    I have no knowledge if Garden Gate did.
19    I doubt if they did.
20    Q    Okay.  Was there any effort to locate the
21    pipeline itself prior to planting the tree?

22 (Pages 82 - 85)

Page 86

1    A    No.
2    Q    Did you know where the pipeline was at
3  the time the tree was planted?
4    A    If you had asked me where is the
5  pipeline, I probably could have lined it up.  But
6  there were no thoughts given to that inasmuch as
7  my right-of-way didn't require us to do such a
8  thing.  It was just use the property and enjoy it,
9  which we did.
10    Q    All right.  If you could have Exhibits 13
11  and 16, we're going to walk through the complaint
12  and the answer.  So let me ask you about Exhibit
13  13 first which is the complaint filed by Columbia
14  in this case.  Have you seen this before?
15    A    I have.
16    Q    And Exhibit 16, which is the answer filed
17  on behalf of you and your wife, have you seen this
18  before?
19    A    This is Exhibit 16?
20    Q    Yes.
21    A    Yes.

Page 87

1    Q    I would like you to turn to page 3 of
2  both documents.  Looking at the complaint in
3  paragraph 15, Columbia alleges that the
4  right-of-way is 50 feet, 25 feet on either side of
5  the pipeline.  Do you dispute that?
6    A    No.
7    Q    If you turn to the next page of the
8  complaint which is page 4, in paragraph 17
9  Columbia alleges that the tree impedes the safe
10  maintenance and operation of the pipeline
11  including access to the pipeline, and also limits
12  Columbia's ability to perform inspections of the
13  pipeline.  And you have denied that allegation.
14        I'm not going to go back over the things
15  that we've talked about already.  So my question
16  is, other than what you've already testified to,
17  is there any other basis for your denial that it
18  interferes with access to the pipeline?
19    A    No.  It is of no more -- in fact, even
20  less complicated to get in there than it is down
21  the pipeline where they have all the roots

Page 88

1  crossing from those huge trees that line their
2  right-of-way.
3    Q    The last sentence says, It affects the
4  ability to perform inspections of the pipeline.  I
5  don't think we've talked about that.  What's the
6  basis for denying that allegation?
7    A    Because they said they've run the pig.
8  They've done the close interval surveys.  And we
9  have seen them walking through there doing
10  whatever they do.  And I believe they have done
11  helicopter inspections as well.
12    Q    Have you had a conversation with anyone
13  about the types of inspections that are conducted
14  by Columbia?
15    A    Probably more Antonio the day of the
16  visit to the house.  And he was talking about the
17  close interval survey, the pig, and that they want
18  to do more of the infrared surveys.  And that
19  could be, again, you know, some new thing they've
20  come up with recently that they want me tree out
21  of the way so they can do that.

Page 89

1        But the tree doesn't have leaves on it
2  for probably half the year.  And in their
3  cornfield they've got -- I mean, it is jam packed
4  full.  If you've have seen how they plant corn in
5  Howard and Montgomery County, that stuff is pretty
6  dense.  So they -- they don't seem to be inhibited
7  there by that, or the deep six-foot roots.
8    Q    Okay.  If you look at the next
9  allegation, paragraph 18, Columbia alleges that
10  allowing the tree to remain creates safety risks
11  including delaying the ability of Columbia to
12  access and repair the pipeline in the event of an
13  emergency.
14        Again, we've talked about this quite a
15  bit already in the deposition.  Is there any other
16  basis for denying that allegation that we've not
17  discussed?
18    A    No.
19    Q    Okay.  The next allegation, paragraph 19,
20  states that the tree also interferes with the
21  cathodic protection of the pipeline and the roots

23 (Pages 86 - 89)

Page 90

1  of the tree can damage the coating of the pipeline
2  which was also denied.
3      Let's start with the back end of that
4  allegation which is the roots of the tree can
5  damage the coating on the pipeline. It's my
6  understanding that the basis for that denial is
7  your contention that the roots are no more than 24
8  to 27 inches deep; is that correct?
9      A   That's correct, based on actually --
10  other than information readily available on the
11  Internet and the different extensive services of
12  the universities, that tree just doesn't have
13  those real deep roots. Very shallow.
14      Q   Do you know what the depth of the cover
15  is over the pipeline at the location of the tree?
16      A   As near as we can calculate it, it would
17  be four feet according to Columbia's own engineer
18  at its original installation. And then there's
19  the dirt that was feathered out from the
20  foundation of the house at the time it was built,
21  in addition to any dirt that was added at the time

Page 91

1  the maple tree was planted and mounded up to.
2      Q   You were not involved with the
3  construction of the home, correct?
4      A   Not at all.
5      Q   And I understand --
6      A   It was completely built, to be clear.
7      Q   Right.
8      A   When I saw the house, it was turnkey.
9      Q   Okay. So what was actually done with the
10  soil and the dirt when the house was built, you
11  have no personal knowledge of that, correct?
12      A   No. I can only look at the site and the
13  rest of the lay of the land where it was mounded
14  up in the back and tapered off and where it was
15  mounded in the front and tapered off and where the
16  end of my house has the walkout basement. So I
17  would have to be almost brain dead not to see
18  where the dirt went or where it disappeared to
19  because they didn't haul it away.
20      Q   Well, I understand that that's your
21  assumption, but you don't know -- you don't have

Page 92

1  actual knowledge of what was done with that dirt?
2      A   That's correct.
3      Q   And you don't know what was actually done
4  when the tree was planted in 1976, correct?
5      A   I know it was planted, and I know that it
6  wasn't -- that it was above the grade that existed
7  when we bought the house which had that dirt
8  feathered out there and sloped out. So I know
9  that there was dirt added.
10      Q   Do you know how much dirt was added at
11  the time the tree was planted?
12      A   No. I'm looking at the tree, and it
13  appears to be about 12 to 13 inches or so.
14      Q   Okay. Now looking at the first part of
15  the allegation in paragraph 19, that the tree
16  interferes with the cathodic protection of the
17  pipeline, what's the basis for denying that
18  allegation?
19      A   It's impossible to interfere with it with
20  those shallow roots. It's not possible. And if
21  that were -- if that were the problem and if it

Page 93

1  were possible, they would be trenching all the way
2  down through the woods and getting rid of those
3  massive crisscrossing roots from the sycamore
4  trees and the American elms and other trees that
5  line that right-of-way with roots 120, 460 feet
6  out.
7      Q   I understand it's your position that
8  those roots would not interfere with the cathodic
9  protection, but what's the basis for that?
10      A   They're not there.
11      Q   What's not there?
12      A   The roots. How would they interfere with
13  the cathodic protection if the pipe is four feet
14  down -- I mean originally and then you have
15  another foot to two feet of dirt on top of that
16  and you have 24-inch roots on my tree, how would
17  that possibly interfere with it?
18      Q   So your position is the distance between
19  the roots of the tree and the pipeline do not
20  cause any problem with the cathodic protection?
21      A   I'm not a scientist. I couldn't -- I do

24 (Pages 90 - 93)

Page 94

1  not know. But from what I understand, that would
2  not be a problem. And if it were a problem, they
3  have a cathodic protection problem for thousands
4  and thousands of miles of pipeline that run
5  through wooded right-of-ways because those roots
6  are extensive.
7      Don't take my wood for it. Just Google
8  it. Those tree roots run out hundreds of feet.
9  And just because they clear the right-of-way the
10 tree roots don't stop growing.
11    Q   Take a look at the next paragraph in the
12 complaint which is paragraph 20 which alleges that
13 if the tree is not removed, there could be an
14 increased risk of property damage, personal injury
15 and disruption of gas service which is also --
16 these allegations are all denied. What's the
17 basis for denying those allegations?
18    A   Same as in the previous one. The roots
19 are not a problem and that it would take no longer
20 to clear that than it would for them to clear the
21 roots in the right-of-way through the rest of the

Page 95

1  woods from those huge trees.
2      Q   I'm going to have you take a look now at
3  Exhibit 18. Mr. Haas, I would like you to take a
4  look at what's been marked as Exhibit 18 which are
5  you and your wife's interrogatory responses in
6  this case. Have you seen this document before?
7      A   Yes, sir.
8      Q   If you would turn to page 11, is that
9  your signature on the verification line? The
10 second signature?
11    A   It is.
12    Q   If you would turn back to page 2 of the
13 interrogatory responses, there is discussions
14 about inspections over the years. And you talk
15 about 2017, which we've discussed quite a bit
16 already, and in the spring of 2010. I would like
17 to go back to May 2010 and move forward from
18 there.
19      In that time frame did you have any --
20 2010 time frame, any conversations with anyone at
21 Columbia about the tree or what they intended to

Page 96

1  do with respect to your property?
2      A   To my recollection -- and I think that
3  was the time -- and if you said I had to swear
4  that that was the precise time, I couldn't say yes
5  if a gun was held to my head if the answer was
6  wrong.
7      But as I recall, when they were coming
8  through -- because of Antonio Redd's letter in
9  2010, when the gentlemen were coming through, I
10 was extremely concerned about what the letter said
11 about clearing the right-of-way and cutting
12 everything down and I asked about the red maple
13 tree.
14      Now, if it wasn't that time, it was a
15 time either prior or after that. And the guy
16 said, Mr. Haas, we're not touching your tree.
17 We're not touching anything. We're just doing
18 whatever we do. And that was when in 2010 they
19 did the close interval survey where they put the
20 little wire across it. Like I said, I never heard
21 from Columbia that they had any problem with that

Page 97

1  test and couldn't complete it.
2      Q   Do you recall anybody in particular that
3  you spoke to --
4      A   You're kidding.
5      Q   -- at that time?
6      A   No.
7      Q   Okay. Other than the close interval
8  survey -- let me ask you about that. Did you
9  actually observe that being done?
10    A   Just very casually but no. If they did
11 it, they did it and got out of the way. I was
12 just concerned about the tree.
13    Q   Okay. So were you actually at the
14 property when they did the close interval survey?
15    A   Well, I -- if that was the time I talked
16 to the guys and expressed my concern about the
17 tree and they reassured me they weren't cutting
18 anything or whatever, then that would have been
19 the time. But I don't remember their test or
20 anything.
21    Q   Okay. When was the next time, moving

25 (Pages 94 - 97)

Page 98

1  forward from 2010, that you had any contact or
2  conversation with anyone from Columbia?
3      A   Almeda Tincher sent a letter in 2016
4  regarding maintenance -- by the way, this is a
5  general mail out -- one of their general mail-out
6  letters. It says, Please be aware all -- she
7  starts out, Dear pipeline neighbor, part of the
8  ongoing commitment to public safety, et cetera,
9  TransCanada's pipeline, administrators are right
10  away using a variety of vegetation and control
11  methods.
12          Then it says, Please be aware all
13  vegetation in the right-of-way that does not meet
14  Columbia's minimum guidelines -- there's that term
15  again -- for construction enclosed is subject to
16  removal. And so that was -- that was in
17  October -- dated October 6th, 2016, from Almeda
18  Tincher.
19      Q   And we've already discussed the
20  subsequent meetings between you and Columbia Gas
21  after you received that, correct?

Page 99

1      A   Yes.
2      Q   Prior to 2010, had you observed any work
3  or inspections being performed by Columbia in the
4  right-of-way?
5      A   Periodically. Periodically but not -- I
6  do not ever recall them going through and clear
7  cutting. If they did, I didn't -- since it didn't
8  affect my property, I probably didn't pay much
9  attention.
10      Q   In that pre-2010 time frame when you
11  observed somebody from Columbia, the gas company,
12  was it just somebody walking through, or what did
13  you observe?
14          MR. ROST: I just want to note for the
15  record that the plaintiff has objected to our
16  discovery request for inspections prior to 2010.
17  He can certainly answer your questions about that,
18  but there's a little bit of an inconsistency there
19  for you to ask him questions when you have claimed
20  that it's irrelevant.
21          But go ahead. Answer the question.

Page 100

1          THE WITNESS: What was the question?
2          MR. ROST: What inspections prior to
3  2010 --
4  BY MR. DINGMAN:
5      Q   What did you observe prior to 2010 with
6  respect to any inspections by Columbia?
7      A   It just would have been as we would have
8  observed them coming through. Again, see, this
9  was not an issue that was at the forefront of our
10  minds as to what they are -- we just knew there
11  was a pipeline there and, you know, when they
12  would come through, they would do a visual
13  inspection or whatever they would do.
14          And so there was never much -- you know,
15  wave. Hi. Good morning, whatever. There was
16  also -- interestingly enough, my neighbor
17  mentioned to me a pipeline, I think, behind his
18  property which I think was a defunct or a
19  discontinued pipeline or something. But he's seen
20  people back there either checking or whatever.
21  But I know very little about that.

Page 101

1      Q   Okay. Turn to page 5 of the
2  interrogatory responses. There's a number of
3  folks who have been identified as people with
4  knowledge of the tree. We've talked about some of
5  them already. So let me just ask about the ones
6  we have not discussed. Who is Lew Bloch?
7      A   He's the arborist that came out to look
8  at the tree.
9      Q   Was he assisted by anybody?
10      A   No.
11      Q   Kelly Lewis with Ruppert. We've already
12  discussed Mr. Lewis, correct?
13      A   Right.
14      Q   Who is the next person, Tony --
15      A   Tony Mucciardi. He and Diane Knighton --
16  I contacted Tony Mucciardi, and Diane Knighton was
17  the one that actually came out and did the radar
18  survey.
19      Q   Okay. Did you ever speak or meet with
20  him?
21      A   No. Oh, speak, yes, on the phone.

26 (Pages 98 - 101)

Page 102

1  Q   Okay.  Was that just to arrange them

2  coming out?

3  A   Correct.

4  Q   So who conveyed to you the results of

5  that testing?

6  A   Diane Knighton.

7  Q   What did she tell you?

8  A   That the roots are 24 to 27 inches and

9  gave the graph of those.

10  Q   Grant Rewega we've talked about.

11  A   Grant Rewega, right.

12  Q   SavATree we have discussed.  There is a

13  reference to crew members.  Were there any crew

14  members that you recall having a conversation

15  with?

16  A   Yeah.  There was a Vince guy that I

17  mentioned earlier.  Then there was a great big --

18  almost seems, I think, like he had an island

19  accent.  The very first people I talked -- I went

20  down -- there were coming up to where they would

21  have to take Baldwin's huge oak tree, and they

Page 103

1  hadn't taken it yet.

2  I said, I have this brochure at my house.

3  He said, I put it there.

4  I said, I have a red maple.

5  He said, You have a stone house?

6  I said, Yes.

7  He said, I know.  That tree is beautiful.

8  And we're supposed to cut it.

9  I said, You're not cutting that tree.

10  And he said, I hope we don't have to.  He

11  said, We like to save trees, but, he said, right

12  here we're clearing trees.

13  Q   So this person was with SavATree?

14  A   Yeah.  Just a very nice -- he was just

15  there cutting tree.  Just doing his job.

16  Q   If you could turn to page 9 of the

17  interrogatory responses, interrogatory 16 asked

18  about any damages that you contend you would incur

19  if the tree is removed.  And there is an attached

20  report.  Are there any other damages that you're

21  claiming other than what's in that report?

Page 104

1  A   You mean other than a nervous breakdown,

2  doctor bills and that sort of thing?

3  Q   Yes.

4  A   No.  It would be the irreplaceable value

5  of the tree.  It would be the devaluation in the

6  resale of our house which would be substantial.

7  Q   Have you done any analysis to determine

8  what the impact you think would be on the resale

9  of the house?

10  A   In my opinion it would be substantial

11  meaning more than $50,000, less than 150,000.

12  Q   Have you had an appraiser or real estate

13  agent that --

14  A   I have not because the tree is still

15  there.  And that would be something to be broached

16  if, God forbid, the tree ever had to come down.

17  MR. DINGMAN:  Okay.  Why don't we go off

18  the record.  I think I may be done.

19  (A recess was taken from 1:11 to 1:13

20  p.m.)

21  MR. DINGMAN:  That's all the questions I

Page 105

1  have.

2  MR. ROST:  We will not waive.

3  (Signature not waived.)

4  (Whereupon, at 1:15 p.m., the

5  deposition of MELVIN HAAS

6  was concluded.)

7      *    *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

27 (Pages 102 - 105)

|  | Page 106 |
|---|---|
| 1 | CERTIFICATE OF NOTARY PUBLIC |
| 2 | I, Suzanne Marie Alona Enderson, the |
| 3 | officer before whom the foregoing deposition was |
| 4 | taken, do hereby certify that the witness whose |
| 5 | testimony appears in the foregoing deposition was |
| 6 | duly sworn by me; that the testimony of said |
| 7 | witness was taken by me in stenotype and |
| 8 | thereafter reduced to typewriting under my |
| 9 | direction; that said deposition is a true record |
| 10 | of the testimony given by said witness; that I am |
| 11 | neither counsel for, related to, nor employed by |
| 12 | any of the parties to the action in which this |
| 13 | deposition was taken; and, further, that I am not |
| 14 | a relative or employee of any counsel or attorney |
| 15 | employed by the parties hereto, or financially or |
| 16 | otherwise interested in the outcome of this |
| 17 | action. |
| 18 | SUZANNE MARIE ALONA ENDERSON |
| 19 | Notary Public in and for |
| 20 | the State of Maryland |
| 21 | My commission expires:  11/23/18 |

|  | Page 108 |
|---|---|
| 1 | Bradshaw Rost, Esquire |
| 2 | Tenenbaum & Saas P.C. |
| 3 | 4504 Walsh Street |
| 4 | Suite 200 |
| 5 | Chevy Chase, Maryland  20815 |
| 6 | IN RE:  Columbia Gas Transmission vs. Janet Haas, |
| 7 | Dear Mr. Rost, |
| 8 | Enclosed please find your copy of the |
| 9 | deposition of MELVIN HAAS, along with the original |
| 10 | signature page.  As agreed, you will be |
| 11 | responsible for contacting the witness regarding |
| 12 | signature. |
| 13 | Within 30 days of September 28, 2017, please |
| 14 | forward errata sheet and original signed signature |
| 15 | page to counsel for Plaintiff, Michael Dingman. |
| 16 | If you have any questions, please do not |
| 17 | hesitate to call.  Thank you. |
| 18 | Yours, |
| 19 | Suzanne Marie Alona Enderson |
| 20 | Reporter/Notary |
| 21 | cc: Michael Dingman, Esquire |

|  | Page 107 |
|---|---|
| 1 | A C K N O W L E D G E M E N T   O F |
| 2 | D E P O N E N T |
| 3 |  |
| 4 | I, MELVIN HAAS, do hereby acknowledge I have read |
| 5 | and examined the foregoing pages of testimony, and |
| 6 | the same is a true, correct and complete |
| 7 | transcription of the testimony given by me, and |
| 8 | any changes or corrections, if any, appear in the |
| 9 | attached errata sheet signed by me. |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 | Date          MELVIN HAAS |
| 20 |  |
| 21 |  |

|  | Page 109 |
|---|---|
| 1 | Capital Reporting Company |
| 2 | 1250 I Street, Northwest |
| 3 | Suite 350 |
| 4 | Washington, D.C.  20005 |
| 5 | (202) 857-DEPO |
| 6 |  |
| 7 | E R R A T A   S H E E T |
| 8 | Case Name:  Columbia Gas Transmission, LLC, vs. |
| 9 | Janet Haas, et al. |
| 10 | Witness Name:  MELVIN HAAS  Job No. 2706743 |
| 11 | Deposition Date:  Wednesday, September 13, 2017 |
| 12 | Page No.  Line No.   Change/Reason for Change |
| 13 | _____ |
| 14 | _____ |
| 15 | _____ |
| 16 | _____ |
| 17 | _____ |
| 18 | _____ |
| 19 | _____ |
| 20 | _____ |
| 21 | _____ |

28 (Pages 106 - 109)