COLUMBIA GAS TRANSMISSION, LLC,

    Plaintiff,

    v.

JANET MALIN HAAS and
MELVIN LEROY HAAS,

    Defendants.

Civil Action No. TDC-17-1147

## MEMORANDUM OPINION

Plaintiff Columbia Gas Transmission, LLC ("Columbia") filed this breach of contract action against Defendants Janet Malin Haas and Melvin Leroy Haas ("the Haases") to enforce an easement traversing Defendants' residential property. Columbia asserts that a Japanese maple tree planted near an underground gas pipeline owned by Columbia must be removed under the terms of the easement. Defendants oppose the removal of the tree and have also filed a Counterclaim in which they assert that if the tree is removed, Defendants should be compensated for its loss. After granting summary judgment to Columbia on the issue of the width of the easement and finding it to be 50-feet wide, the Court conducted a three-day bench trial to determine liability and damages on all remaining issues. Pursuant to Federal Rule of Civil Procedure 52(a), the Court now provides its findings of fact and conclusions of law. For the reasons set forth below, the Court finds that Columbia has not met its burden of proof and will enter judgment for Defendants.

## FINDINGS OF FACT

At trial on May 22, 23, and 24, 2019, the following witnesses testified: Karen Stephenson, Columbia's corporate representative and manager of its right-of-way maintenance program;

Antonio Redd, a senior land agent for Columbia; Francis Stone, a former welder and transmission mechanic for Columbia; William Rew, a former corrosion technician for Columbia; Andrew Kvasnicka, a pipeline engineer for Columbia, who was qualified as an expert in pipeline safety and operations; Lewis Bloch, who was qualified as an expert arborist; Donald Zimar, who was also qualified as an expert arborist; John Kelly Lewis, the general manager of Ruppert Nurseries, who was qualified as an expert on tree valuation, tree roots, and the removal of trees; Leonard Murphy, the Haases' family attorney; and both Mr. and Mrs. Haas. Based on the witness testimony, as well as documentary exhibits offered by both parties, the Court finds the following facts.

## I.    History

On February 21, 1955, Columbia's predecessor in interest, Atlantic Seaboard Corporation, was granted an easement pursuant to a Right of Way Agreement ("ROW Agreement") relating to the real property now located at 421 Brighton Knolls Drive, Brinklow, Maryland 20862 ("the Property"). The easement is 50 feet wide: 25 feet on either side of a natural gas transmission pipeline. The ROW Agreement states, in pertinent part:

> It is agreed that the gas line to be laid under this grant shall be constructed and maintained below cultivation, so that Grantors may fully use and enjoy the premises, subject to the rights of the Grantee to maintain and operate said lines.
>
> Also where necessary and convenient, Grantee may haul over the above described lands such pipe and material needed in the construction of the lines on adjoining lands.
>
> Grantee further agrees to pay for any damages that may arise from the maintenance, operation and removal of said lines.

Trial Exhibit ("Ex.") 1. Pursuant to the ROW Agreement, in 1955, Columbia's predecessor installed within the easement a 26-inch high-pressure natural gas transmission pipeline known as

Line MB 26 ("the Pipeline"). The Pipeline has operated continuously since 1955 and delivers natural gas to Pennsylvania, Maryland, Virginia, and Washington, D.C.

The Haases purchased the Property on March 27, 1975 and received a copy of the ROW Agreement. On July 12, 1976, they had a Japanese red maple tree ("the Maple Tree") planted within the easement. Mr. Haas grew up on a farm and has a passion for landscaping. He has spent thousands of dollars on landscaping the Property and has spent and continues to spend countless hours every week gardening, performing yardwork, and otherwise working on the landscaping of the Property. The Maple Tree is the centerpiece of its front yard.

For 40 years, Columbia never contacted the Haases regarding the Maple Tree. In May 2010, the Haases received a letter from Columbia, specifically from Redd, stating that Columbia would be conducting vegetation clearing operations in the easement, but no one from Columbia ever followed up. In October 2016, the Haases received another letter from Columbia stating that Columbia would soon begin clearing vegetation, but again no one from Columbia followed up or visited the Property. Finally, in March 2017, Columbia put a flyer on the Haases' door informing them that vegetation clearing in the easement would begin imminently. Soon after, Mr. Haas spotted Columbia employees on his neighbor's property and went to speak to them. The foreman informed Mr. Haas that they would be removing trees, including on the Property. When Mr. Haas objected to the removal of any trees on the Property, the foreman suggested that if Mr. Haas was concerned, he should contact Columbia.

Mr. Haas promptly contacted Columbia and requested that a Columbia representative come out to view the Maple Tree and see that it did not interfere with the Pipeline. After several communications, Mr. Haas was referred to Stephenson. After much insistence, he convinced her to visit the Property. During a visit on March 24, 2017, Stephenson, Redd and another Columbia

3

employee rejected Mr. Haas's pleas not to remove the Maple Tree and insisted that it had to be removed based on Columbia's policy. Redd told Mr. Haas that they would be coming on "Monday or Tuesday to remove your tree." 5/24/19 Tr. at 20-21. On March 30, 2017, as soon as Mr. Haas saw Redd's vehicle and a truck driving up to the Property, he called the police. Redd got out of the vehicle and told Mr. Haas they were there to remove the tree, but Mr. Haas told him to stay back and that he had called the police. Only when police officers arrived and directed the Columbia personnel to leave the premises did they desist in their efforts to cut down the Maple Tree that day. Columbia then filed the instant action seeking a court order authorizing Columbia to remove the Maple Tree.

## II.     Location of the Pipeline

### A.     Proximity to the Maple Tree

The Court finds that the Pipeline runs through the Property and passes approximately two feet away from the trunk of the Maple Tree, with the Pipeline passing near, but not directly under, the trunk of the Maple Tree. The parties have stipulated that the Maple Tree is located 23 feet from the corner of the Haases' house ("the House"), and that the corner of the House is located within 25 feet from the Pipeline. This approximate two-foot distance is consistent with markers located at the Property. According to Redd, in the vicinity of the Maple Tree, there are two pipeline markers, installed by Columbia, which mark the centerline of the Pipeline. Based on these markers, a yellow flag, visible in various photographs admitted as exhibits, was placed along that centerline at the edge of the mulch bed. Together, these three markers mark the centerline and direction of the Pipeline. On May 17, 2019, at Defendants' request and with the assent of Columbia, the Court conducted a View of the Property. It was shown these three markers, and observed, by standing at a location on a straight line between the two pipeline markers and noting

4

the location of the yellow flag along that line, that the center line of the Pipeline passes approximately two feet to the south of the trunk of the Maple Tree, on the side of the tree away from the House. Redd, Columbia's representative at the View, agreed that the Pipeline ran near, but not directly under, the trunk of the Maple Tree. Because the Pipeline is 26 inches in diameter, with 13 inches on each side of the centerline, no part of the Pipeline passes directly under the trunk.

In reaching this conclusion, the Court does not credit Columbia's claim that the Pipeline runs directly under the trunk of the Maple Tree. Columbia argues that the 23-foot distance from the House to the Maple Tree runs to the side of the trunk closest to the House, the 25-foot distance to the Pipeline runs to its centerline, and the Maple Tree trunk is 17-inches wide, such that some portion of the trunk must pass over some portion of the Pipeline. The evidence at trial, however, was insufficiently precise to support this conclusion. Kvasnicka testified that the 25-foot measurement was based on the Columbia land department's review of the plat of the dwelling, but no witness who actually took that measurement testified, and the plat introduced as evidence lacks sufficient detail and resolution to be of any value on this question. Likewise, although Kvasnicka testified that Mr. Haas had measured the Maple Tree at 23 feet from the House, Mr. Haas stated in his deposition, admitted at trial, that his measurements were "approximate." Haas Dep. at 4, Ex. 18. Crucially, there was no evidence of how and at what angle either of the measurements were taken. If both measurements were not taken along the same line from the corner of the House, their two-foot difference in distance would not necessarily translate to a two-foot difference between the side of the trunk closest to the House and the centerline of the Pipeline. This lack of precision in measurements was a recurrent trend at trial.

Although Kvasnicka and Redd testified at various times that the Maple Tree was right on top of the Pipeline, the Court does not find this testimony reliable or credible, to the extent that it

5

could be interpreted as stating that the trunk is directly over the Pipeline. Kvasnicka gave inconsistent testimony, at one point claiming the Maple Tree was "on top" of the Pipeline, but also stating on cross examination that he believed the Maple Tree was "within two feet of the pipeline." 5/22/19 PM #2 Tr. at 31; 5/23/19 Tr. at 25. When the Court asked Kvasnicka to specify how he arrived at his conclusion on the location of the Maple Tree, he clarified that he was simply estimating based on the measurements that he had been provided. Although Kvasnicka is an engineer, he inexplicably never took any measurements himself and did not even visit the Property until after the Court ruled on Columbia's Motion for Summary Judgment. His claim that when he visited, he observed that the Pipeline runs directly under the Maple Tree actually undermines his credibility, where that observation, in no way grounded in any expertise, directly conflicts with the stipulation and the observations at the View that the Maple Tree was approximately two feet off the centerline. The Court finds that Kvasnicka's testimony was too inconsistent, imprecise, and ungrounded in reliable analysis to alter the Court's finding. *See D'Abbracci v. Shaw-Bastian*, 117 P.3d 1032, 1044 (Or. 2005) (affirming the trial court's decision not to credit a utility company's expert when he "merely 'eyeballed' the area without actually taking any measurements").

For the same reasons, the Court likewise rejects Redd's testimony that based on his personal observation, the Maple Tree is "right on" the Pipeline as, at best, imprecise. 5/22/19 AM Tr. at 102. Although Redd asserted that the yellow flag in the ground placed by Columbia to mark the location of the Pipeline, as seen in Exhibit 12-A, establishes that the Maple Tree is "right on" the Pipeline, that testimony is contradicted by Kvasnicka's testimony on cross examination that a single yellow flag, without a second marker to establish the actual direction in which the Pipeline runs, is insufficient to establish the Pipeline's distance from the Maple Tree. Whether Kvasnicka

and Redd were merely imprecise or were attempting to exaggerate the proximity of the Pipeline to the Maple Tree, the Court does not credit their testimony that the Maple Tree is right over the Pipeline, at least to the extent they were claiming that the trunk was directly over the Pipeline. Accordingly, relying on the parties' stipulation as corroborated by the onsite observations at the View, the Court finds that the Pipeline runs approximately two feet to one side of the trunk of the Maple Tree and does not pass directly under the trunk.

**B.    Depth**

As for the depth of the Pipeline, the Court finds that the Pipeline is between four and five feet (48-60 inches) below the ground upon which the Maple Tree sits. On October 12, 2018, in conjunction with this litigation, Francis Stone, a transmission mechanic who worked for Columbia for 37 years, sought to determine the depth of the Pipeline. Stone used both a pipeline locator, a handheld device that takes computerized readings of the depth of the pipeline, and a four-foot long T-bar, a metal bar that is inserted in the ground until it hits a pipeline, to measure the depth of the Pipeline. At a location just outside the circular mulch bed surrounding the tree, which has an approximately nine-foot radius, Stone sunk the T-bar the full four feet to its hilt and hit the Pipeline at that depth, as illustrated by the photograph of the T-bar in the ground in Exhibit 108-F. Although Defendants disputed that Stone actually hit the Pipeline with the four-foot T-bar, Stone testified that he was certain that he felt the Pipeline with the T-bar because there is "a certain feel" to hitting a Pipeline with which he is familiar from prior experience. 5/22/19 PM Tr. at 18. Thus, the Pipeline was located four feet below the ground at that location, approximately nine feet from the Maple Tree. Indeed, Kvasnicka testified that based on the information available to him, the Pipeline averages four feet below ground on the Property.

As for the depth directly below the Maple Tree, the Maple Tree is at a higher grade than the location outside the mulch bed where Stone sunk the T-Bar. Mr. Haas provided unrefuted testimony that he used a mason's level to measure the height of the mulch bed in which the tree is planted, and that it measured one foot high. Such a measurement is consistent with the Court's visual inspection of the Property during the View as well as Exhibit 105-A, which shows that the Maple Tree sits on a raised mound of mulch. Accordingly, the Court finds the Maple Tree's trunk is located somewhere between four and five feet above the level of the Pipeline.

In so finding, the Court does not credit Stone's testimony that he found the Pipeline at 41 inches below the Maple Tree. That testimony is directly contradicted by the photograph, Exhibit 108-F, which Stone acknowledged as showing that the full 48-inch length of the T-bar was in the ground at the location where he found the Pipeline. In light of that evidence, it is clear that Stone's testimony of 41 inches related to his measurement with the pipeline locator. That measurement was unreliable for two reasons. First, Stone testified that the pipeline locator is not a perfect measurement tool and that at one point, his particular instrument could be inaccurate by six inches. Kvasnicka confirmed that in the industry, pipeline locators are only used for general reference rather than exact measurements. Second, where Stone did not write down or otherwise document his measurements, he acknowledged that he could not precisely recall the exact depth reading given by the pipeline locator when he testified, "If I remember correctly, I believe it was 41 inches." 5/22/19 PM Tr. at 12. Indeed, the Court finds that Stone's memory generally was not reliable. He claimed at one point in his testimony that he did not recall intending to bring a six-foot T-bar, as requested by Defendants, but in a video of the October 2018 inspection, Stone states that he did not bring a six-foot T-bar because he hurt his back. He later acknowledged when confronted with his deposition testimony that it was possible that he had planned to bring a six-

8

foot T-bar. Stone also testified that Defendants' counsel had grabbed onto the Maple Tree's branches and stood on the T-bar to make sure that it had actually hit the Pipeline, a fact which other witnesses present for the inspection, including attorney Leonard Murphy and Columbia's expert arborist, Donald Zimar, testified never happened. In light of these discrepancies, and where the photographic evidence confirms that the Pipeline was at least 48 inches below the ground, the Court does not credit Stone's testimony that the Pipeline was 41 inches deep.

## III.    Roots

The Court finds that the Maple Tree's roots extend approximately 20-27 inches below the ground. Lewis Bloch, Defendants' expert arborist, testified that all Japanese maple trees have very shallow root systems, including the particular species on the Property, the burgundy lace Japanese maple. Bloch explained that the key ingredient for proper root growth is oxygen, so all tree roots, especially maple trees, tend to stay close to the surface of the ground and search out better soil conditions, particularly in clay soil, which lacks air pores. Bloch reviewed a separate arborist's report which used a system call TRU radar to assess the depth of the Maple Tree's roots and found that the roots were 27 inches deep. Based on the conclusions of this report, the general characteristics of Japanese maple trees, and his visual examination of the Maple Tree itself, Bloch provided his expert opinion that the Maple Tree's roots are no deeper than 27 inches and more likely extend only 20 to 24 inches below ground.

This opinion is corroborated by the testimony of Kelly Lewis, the General Manager of Ruppert Nurseries, a tree farm specializing in growing, harvesting, and moving large trees. Lewis testified that based on his visual inspection of the Maple Tree and his extensive experience relocating trees, including a number of Japanese maple trees for which he observed the root structures, he concludes that the Maple Tree's roots are no deeper than 24 inches. Like Bloch, he

testified that Japanese maples are shallow-rooted trees, and that in moving Japanese maple trees, his company has rarely found roots deeper than 20 to 24 inches. The Court credits the testimony of Bloch and Lewis and finds that the Maple Tree's roots extend between 20-27 inches below the surface.

Zimar, Columbia's rebuttal expert arborist, provided no testimony inconsistent with this finding. He agreed that Japanese maple trees have shallow root systems but cautioned that individual trees are variable and do not always conform to averages. Here, however, where Mr. Haas testified that the soil at the Property is clay, and Bloch testified that roots in clay soil tend to stay close to the surface because of the lack of oxygen, there is actually a greater likelihood that the Maple Tree's roots have stayed closer to the surface. Although Zimar stated that TRU radar generally has a 20 to 30 percent error rate, he had no specific reason to doubt the TRU radar reading in this case and provided no alternative opinion on the depth of the Maple Tree's roots. Where the only actual measurement placed the roots' depth at 27 inches or less, and Bloch and Lewis had significantly more experience with Japanese maple trees than Zimar, Zimar's testimony provides no basis to alter the Court's finding.

None of Columbia's other witnesses provided testimony to contradict these findings. No witness testified that there is any evidence that the Maple Tree's roots are below 27 inches or touching the Pipeline. All agreed that no testing on the Pipeline near the Maple Tree over the past 40 years has ever shown that its roots had touched or damaged the Pipeline. Although Redd, Rew, and Kvasnicka provided general testimony about the dangers that tree roots pose to pipelines, and offered examples of incidents in which tree roots were found to have interacted with pipelines and damaged their coating, none of those examples involved a Japanese maple tree. Rather, the types of trees that are most likely to damage pipelines, according to Rew, include pine trees and

forsythias.  Indeed, none of Columbia's witnesses could reference a single case when a Japanese maple tree's roots had damaged a pipeline.  Based on the available evidence, the Court finds that the Maple Tree's roots extend from 20-27 inches below the ground and therefore are not touching the Pipeline, which is 48-60 inches below the Maple Tree.

## IV.  Present Need to Access

There is no present need to access the Pipeline in the area at or near the Maple Tree.  The parties agree that when tree roots are touching a pipeline, they can cause damage by eroding the cathodic protection, an electrical field surrounding a pipeline to prevent corrosion, and thus require digging down to the pipeline to conduct repairs.  At the same time, there is no evidence that proximity of roots to a pipeline, absent direct contact, harms the pipeline.  Kvasnicka acknowledged that he does not know how close tree roots have to be to a pipeline to damage its cathodic protection.  Here, beyond the findings that the Maple Tree's roots do not extend to the depth of the Pipeline, none of the testing conducted by Columbia over the years provides any indication that the Maple Tree has damaged the Pipeline or caused a condition requiring intervention.  In particular, a test station located in close proximity to the Maple Tree, just outside the Property, from which a wire running to the Pipeline can provide readings that would show interference with the Pipeline's cathodic protection, has never had readings showing such damage. Columbia also has never been cited for violating federal regulations regarding pipeline safety on the Property.

## V.  Testing

The Court also finds that leakage surveys, close interval testing, and other necessary tests can be successfully conducted without removing the Maple Tree.  Routine surveillance of gas pipelines to identify leaks and other unusual operating or maintenance conditions is required by

federal regulations. *See* 49 C.F.R. § 192.613(a) (2018). There are a variety of ways in which Columbia tests for gas leaks and the structural integrity of its pipelines. These include aerial patrols over the pipeline; walking the pipeline with leak detection equipment; running smart pipeline inspection gauges ("smart PIGS"), which are robotic devices inserted inside the pipeline to test for cracks and dents in the pipeline; taking readings at permanent testing stations located every half mile along the pipeline; and conducting close interval surveys ("CIS"). Columbia argues specifically that the Maple Tree interferes with its ability to conduct aerial patrols and CIS.

In the natural gas pipeline industry, aerial patrols are the primary method for conducting leakage surveys to detect gas leaks, which can be observed from the sky by identifying dead vegetation indicative of a leak or using infrared technology to detect heat from a leak. Stephenson, Redd, and Kvasnicka all testified that tree canopies can interfere with aerial patrols because they obscure the ground from the pilot's view. However, Redd could not confirm that infrared technology would be unable to detect gas rising up from under the Maple Tree in the event of a leak. Moreover, there was no evidence that Columbia had ever attempted an aerial patrol over the Property and had been thwarted by the Maple Tree's canopy. Indeed, under Columbia's Facility Patrol and Inspection Plan, because the Pipeline carries unodorized gas and is classified as a Class 1 or 2 pipeline, a patrol is only to be conducted once every 12 months and, if necessary, could be conducted within 15 months of the previous patrol. There was no evidence that an aerial patrol could not be conducted successfully in the winter, when the Maple Tree is barren of leaves.

Under federal regulations, *see* 49 C.F.R. § 192.705(c), and Columbia's own Facility Patrol and Leakage Protection Plan, aerial patrols are not required to conduct a leakage survey. Rather, such a survey may be conducted by walking, driving, flying, or other methods of observing the right-of-way. In fact, the Plan specifically identifies circumstances under which non-aerial patrols

12

are required, including in areas where vegetation is normally dead or dormant, where there are deep or large rivers, and where the "canopy on the right-of-way obstructs the pilot's or observer's view of the ground." Ex. 121 at 6. Notably, Columbia only began conducting leakage surveys via aerial patrol 20 years ago, such that for the first approximately 20 years of the coexistence of the Pipeline and the Maple Tree, leakage surveys were performed by foot patrols or other means. Thus, the Maple Tree does not prevent the conduct of leakage surveys.

The Maple Tree also does not prevent Columbia from conducting a CIS, a method for checking that the Pipeline's cathodic protection is functioning properly. First, according to Kvasnicka, a CIS is conducted only when a reading from a test station located along a pipeline detects a problem. Test stations assess cathodic protection through the use of a wire running down to the Pipeline. As it turns out, there is a test station located just off the Property in close proximity to the Maple Tree, the readings from which have never shown a problem with the cathodic protection of the Pipeline. Thus, there has been no need for a CIS, and Columbia has offered no evidence establishing that it has ever conducted a CIS on the Property.

Second, even if a CIS were needed in the future, the Maple Tree would not interfere with it. When conducting a CIS, an individual wearing a copper wire, while hooked up to a computer and the closest test station, walks over the ground along the pipeline so that the wire falls upon the centerline of the pipeline and prongs are placed approximately every 2.5 to 10 feet on either side of the pipeline, which send readings to the computer. Later, engineers download the data and determine whether the cathodic protection is functioning properly. Where the Court has found that the trunk of the Maple Tree does not sit over the Pipeline, it would not prevent the wire from being placed along the centerline. Even if the trunk were actually on top of the centerline, under Columbia's External Corrosion Control Plan, the CIS prongs may be placed from 2.5 to 10 feet

13

apart along the centerline. Thus, where the trunk of the Maple Tree is less than two feet wide, the trunk would not prevent the placement of the CIS prongs at the required intervals. Notably, although CIS prongs cannot be inserted through asphalt, Columbia still permits roads and driveways to cross a pipeline. In such instances, Columbia conducts a CIS by taking readings on both sides of the road and skipping the portion of the pipeline running underneath the asphalt. Finally, although Rew asserted that the presence of tree roots might interfere with CIS readings, the Court does not credit that claim because it was contradicted by his own deposition testimony that the readings would go through anything, and it conflicted with the finding of a Pacific Gas & Electric study that tree roots likely do not interfere with such readings. The Court therefore finds that a CIS can be conducted effectively on the Property without the removal of the Maple Tree.

## VI.    Emergency Removal

Although federal regulations governing safe pipeline management generally require that gas companies identify and assess potential threats to pipelines, *see* 49 C.F.R. § 192.917(a), none of the regulations mandate that trees near or even directly over pipelines must be removed for safety reasons. Nevertheless, the Court finds that in the event of an emergency, the Maple Tree could be removed in four to eight hours, depending on the conditions. According to Lewis, an expert in tree removal, because the Maple Tree's roots extend approximately two feet below ground, it could be removed in as little as 20 to 30 minutes, and no more than two hours, using a backhoe or an excavator, which would only need to penetrate less than a foot below the surface. If the need to remove the Maple Tree were to be based on a concern that the roots were entangled with the Pipeline, the Maple Tree could be removed in four to five hours by digging from the side and using an air spade, which blows away the dirt from the tree roots. If an air spade could not be

used, removal by hand digging would take six to eight hours. The Court credits Lewis's expert testimony on this issue.

Columbia's witnesses did not refute these estimates. Although Zimar, Columbia's rebuttal witness, testified that mechanical digging tools should not be used within 18 inches of a pipeline, and that hand digging would be slowed down if air tools could not be used, such as when the ground is frozen, he provided no estimate of how long it would take to remove the Maple Tree. Likewise, while Kvasnicka testified that the presence of the Pipeline would require the tree to be cut and removed in pieces above ground and then excavated from the side with an air spade or by hand, an approach similar to that discussed by Lewis, Kvasnicka also testified that he has never seen tree roots excavated from a pipeline or participated in tree removal and thus does not know how long it would take to remove the Maple Tree.

Where the need to remove the Maple Tree would presumably be based on a concern relating to the Pipeline, the Court finds that removing the tree under such circumstances would take from four to eight hours, depending on whether an air spade could be used. Where Stephenson testified that Columbia has a list of contractors on retainer to remove trees who will respond immediately, the time needed to get a contractor on site would not appreciably add to the overall removal time.

## VII. Tap

Finally, the Court finds that Columbia has failed to establish the presence of a tap at a location sufficiently close to the Maple Tree that the tree must be removed in order to excavate and service the tap. A tap is a smaller branch connected to the main transmission pipeline that was once intended to facilitate supplying gas to customers on the property where it is located. Taps are typically one inch in diameter, protrude vertically from the main pipeline at the 12 o'clock

position, are coated with tar or some form of protective coating, and contain gas but are sealed at the top when not in use.

During the October 2018 inspection, Stone, using the pipeline locator, perceived an object at 27 inches below ground. At trial, Stone testified that this object was 6 to 12 inches from the trunk of the Maple Tree. Neither of these measurements were ever documented, nor is there any photographic evidence establishing the location where Stone found this object. Stone did not use the T-bar to confirm the location of the object or to ascertain what it was. At the time, Mr. Haas told Stone that what he found at that location might have been buried lights, as Mr. Haas had put three bronze solid-cast lights with wires in the ground near the Maple Tree. Stone stated, "I'm not sure what that is" and moved on. 5/23/19 Tr. at 194. At the time, he did not tell anyone that he believed that he had found a tap.

According to Kvasnicka, smart PIG data from December 2013 establishes the presence of a tap with GPS coordinates that correspond to the Property. In denying the Motion for Summary Judgment, the Court ruled that there remained a genuine issue of material fact on the location of the tap and its proximity to the Maple Tree, including because there was no evidence on whether the GPS coordinates were of sufficient specificity to establish that the tap was actually under the Maple Tree. *See Columbia Gas Transmission, LLC v. Haas*, 341 F. Supp. 3d 607, 618 (D. Md. 2018) (*"Haas I"*). Despite this ruling, at trial Columbia failed to provide persuasive evidence of the tap's actual location. While the GPS coordinates of the tap were identified in Exhibit 7, the coordinates were illegible, and no witness or exhibit established the precise location of those coordinates on the Property or in relation to the Maple Tree. Moreover, no GPS coordinates were provided for the location of either the trunk of the Maple Tree or the underground object found by Stone. Although Kvasnicka claimed that he knew that the PIG's GPS coordinates corresponded

with a location at some unspecified distance beside the Maple Tree because Stone used a handheld GPS device to identify the location of those coordinates, Stone never testified about using a handheld GPS device on the Property, nor were any GPS coordinates from such a device ever recorded.

Further, when Kvasnicka was asked about the tolerance of the GPS device allegedly used by Stone, he stated that he did not know. Kvasnicka also could not identify the degree of specificity of the GPS coordinates from the smart PIG data. Using the courtroom as an example, Defendants' counsel asked Kvasnicka whether the GPS coordinates from the PIG data would show that he was standing at the podium or just somewhere in the courtroom, and Kvasnicka could not answer.

In light of the inconsistencies and the stunning lack of precision and documentation in the testimony and evidence on this issue, the Court cannot credit the subjective beliefs of Kvasnicka and Stone that the tap is, in fact, located within a foot of the Maple Tree. As discussed above, where the reliability of Stone's memory of events is in real question, the Court will not rely on his claims that he did not think the object he found was one of Mr. Haas's lights, and that unspecified engineers, who did not testify at trial, determined that the object he found was a tap. Likewise, where Kvasnicka's testimony on this and other points lacked specificity and documentation and instead veered toward sweeping conclusions, the Court cannot assume the accuracy of his claim that the tap is actually directly under the Maple Tree and will not so find. Where Columbia has not established the actual location of the tap on the Property, even with Kvasnicka's testimony that excavation of the tap would require a hole with a diameter of "a couple of dozen feet," the Court does not find that such excavation would necessarily require the removal of the Maple Tree. 5/23/19 Tr. at 108.

17

The Court further finds that Columbia has not established that pipeline maintenance actually requires excavation of the particular tap on the Property. Kvasnicka testified that when Columbia discovers a tap, it generally puts the tap on a list to be investigated, which would consist of digging down to the tap and encapsulating it with a steel pipe to properly abandon it. However, Rew, Columbia's former corrosion technician who the Court finds to be more credible on this point, testified that the excavation and abandonment of taps along the Pipeline itself has been precipitated by adverse readings from testing and close interval surveys. Notably, no such test results have been identified on the Property. Moreover, no witness identified any provision in federal regulations or Columbia's internal policies, or even a standard industry practice, that all taps must be excavated and abandoned.

The actual need to excavate this tap is further undermined by the fact that the data from a smart PIG inspection in December 2013 identified the existence of a tap on the Property, but Columbia never investigated the tap or decided to put it on a list for service until this lawsuit was pending. Kvasnicka's first expert report relating to this case, dated August 14, 2017, did not even mention the tap. Under these circumstances, where there is no written policy requiring excavation of all taps, there were no adverse test results prompting such a need as was the case with other taps along this Pipeline, and Columbia was aware of this tap for many years but only decided to address this tap after it had filed suit in this Court and was trying to justify the removal of the Maple Tree, the Court finds that Columbia has failed to establish that there is an actual need to excavate the tap.

## VIII.   Third Party Damage

The Court further finds that even with the Maple Tree present, the risk that a third party will dig at or near the Maple Tree without knowledge of the Pipeline's presence is minimal to

18

nonexistent. Where third party damage by construction or utility equipment is the most common cause of damage to pipelines, Redd testified that pipeline markers are the primary form of public awareness and that it is important to be able to stand at one pipeline marker and see to the next. Although Redd and Kvasnicka testified that the Maple Tree, as well as a smaller lilac bush on the corner of the Property, prevent an observer standing at one pipeline marker from having an unobstructed view of the next pipeline marker, Mrs. Haas testified that when standing on the Property's lawn, between the pipeline markers, both can be seen, in opposite directions, from the same location, approximately midway between them. The Court credits Mrs. Haas's observation because it was confirmed during the View. Thus, the presence and direction of the Pipeline is discernible from a location near the Maple Tree. Moreover, the portion of the Pipeline near the Maple Tree is located in the front yard of the Property, near the House and inside a fence, such that anyone engaged in unauthorized digging would have to trespass deep into the Haases' Property and dig directly in front of their house. Mr. Haas testified that he is prepared to post no trespassing and no excavation signs showing the location of the pipeline on the Property, and both he and Mrs. Haas assured the Court that they would never permit a third party to dig on the Property anywhere near the Pipeline without first notifying Columbia. Indeed, the fact that Mr. Haas perceived and prevented Columbia's attempt to enter the Property and cut down the Maple Tree without his permission illustrates that the risk of unauthorized digging on the Property is very low.

## CONCLUSIONS OF LAW

Columbia seeks a declaratory judgment that the Maple Tree interferes with Columbia's rights under the ROW Agreement and may be removed, as well as an injunction ordering Defendants to permit Columbia to remove the Maple Tree from the easement and prohibiting Defendants from placing any tree within the easement on the Property without Columbia's express

19

consent. Accordingly, the disposition of this case turns on whether the Maple Tree violates Columbia's rights under the ROW Agreement.

## I.  Legal Standards

In Maryland "[t]he interpretation of mortgages, plats, deeds, easements and covenants has been held to be a question of law." *Webb v. Nowak*, 72 A.3d 587, 596 (Md. 2013). An easement created by a deed, known as an express grant, is interpreted by applying traditional rules of contract interpretation to the conveying document. *See Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 68 A.3d 843, 855–56 (Md. 2013); *Chevy Chase Land Co. v. United States*, 733 A.2d 1055, 1073 (Md. 1999) ("[T]he primary consideration in construing the scope of an express easement is the language of the grant."). When interpreting express grants, "a court should ascertain and give effect to the intention of the parties at the time the contract was made, if that be possible." *Miller v. Kirkpatrick*, 833 A.2d 536, 545 (Md. 2003) (quoting *Buckler v. Davis Sand & Gravel Corp.*, 158 A.2d 319, 322 (Md. 1960)). Hence, the court's "focal point is the language of the agreement itself[,] seeking to discern what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Long Green Valley*, 68 A.3d at 856 (internal citation omitted).

In evaluating an easement under contract law, a court must first "determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face." *Wash. Metro. Area Transit. Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (quoting *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)). A contract is ambiguous if it is "susceptible to two reasonable interpretations." *Potomac Inv. Props., Inc.*, 476 F.3d at 235. If a contract is ambiguous, such as "when the intent of the parties and the purpose of" of the contract "cannot be divined from the actual language," the court may turn to extrinsic evidence of the

parties' intent. *City of Bowie v. MIE, Props., Inc.*, 922 A.2d 509, 523 (Md. 2007) (discussing the interpretation of restrictive covenants).

In ruling on Columbia's Motion for Summary Judgment, the Court provided its interpretation of the ROW Agreement, which the Court reaffirms and incorporates by reference. *See Haas I*, 341 F. Supp. 3d at 614-16. In summary, the Court held that the ROW Agreement, which states that the Pipeline was to be "constructed and maintained below cultivation, so that Grantors may fully use and enjoy the premises, subject to the rights of [Columbia] to maintain and operate said line," unambiguously authorizes Defendants to engage in all uses of the land to the extent that they do not interfere with Columbia's right to maintain and operate the pipeline. *Id.* at 614. Thus, the Court held that there is no automatic prohibition on the planting of trees in the easement, that the ROW Agreement contemplates that there will be cultivation within the easement, and that the ROW Agreement generally requires that the Pipeline remain at a depth below the level to which plant roots, including the roots of cultivated trees, descend. *Id.* at 615 (citing *Columbia Gas Transmission, LLC v. Ott*, 984 F. Supp. 2d 508, 513, 519-20 (E.D. Va. 2013)).

Based on the Court's interpretation of the easement, the Maple Tree's presence is in violation of the easement only if Columbia has shown that the tree unreasonably interferes with its ability to maintain and operate the pipeline. *Rogers v. P-M Hunter's Ridge, LLC*, 967 A.2d 807, 819 (Md. 2009) (stating that in the event of an easement, "the land remains the property of the owner of the servient estate, and he is entitled to use it for any purpose that does not interfere with the easement"); *Miller*, 833 A.2d at 544 (stating that the owner of the servient estate may not impose an obstruction that would "prevent or interfere with the[] reasonable enjoyment" of the holder of the easement); Restatement (Third) of Property § 4.9 (Am. Law Inst. 1007) ("[T]he

holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude."). The Court articulated this standard in its summary judgment opinion, *Haas I*, 341 F. Supp. 3d at 616, and the parties generally agree that it applies to this case. Thus, "in a word, this case comes down to 'reasonableness.'" *Columbia Gas Transmission, LLC v. Grove Ave. Developers, Inc.*, 357 F. Supp. 506, 517 (E.D. Va. 2019).

## II.    Settlement Discussions

As a threshold matter, the Court must address an evidentiary question: whether admissions by Stephenson in her telephone conversation with Mr. Haas on March 16, 2017, and then again in person on March 24, 2017, are "statement[s] made during compromise negotiations about the claim" and thus inadmissible under Federal Rule of Evidence 408. Defendants have sought to offer Mr. Haas's testimony that in those conversations, Stephenson told him that Columbia's own arborists had reported that the Maple Tree's roots are shallow and non-invasive but that they would cut the tree down anyway. Columbia argues that where Defendants seek to use these statements to "disprove the validity" of Columbia's claim that the tree must be removed, they are inadmissible. Fed. R. Evid. 408(a)(2).

Although these statements were made prior to the commencement of this litigation, compromise negotiations regarding a disputed claim may exist before litigation has commenced. *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 528 (3d Cir. 1995). "To determine whether the statements are covered by [Rule 408], the inquiry is whether the statements or conduct were intended to be part of the negotiations for compromise." *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 654 (4th Cir. 1988). Thus, offers to settle, or statements made alongside offers to settle, are "excluded even if no settlement negotiations follow" or if the party to whom the offer is

made refuses to engage in compromise negotiations. *United States v. Davis*, 596 F.3d 852, 859 (D.C. Cir. 2010).

Although Mr. Haas has credibly testified that Stephenson and other Columbia representatives were unrelenting in their demand that the Maple Tree be removed, Stephenson has testified that her goal in her phone conversation and meeting with Mr. Haas was to settle the matter. Columbia has introduced a March 17, 2017 email that Stephenson sent to Columbia's senior management team and legal counsel which recounts her telephone conversation with Mr. Haas, in which she offered to pay for landscaping services and Mr. Haas asked whether Columbia would pay the value of the Maple Tree, which he estimated at $30,000. In the email, Stephenson also stated that she was scheduling the March 24, 2017 site visit "to discuss the settlement." Ex. A. In light of this record, the Court finds that while Mr. Haas interpreted Columbia's unwillingness to consider leaving the Maple Tree in place as a refusal to compromise, Stephenson intended both conversations to be part of settlement discussions, albeit on terms favorable to Columbia. Because it is the offeror's intent that is controlling, *see Fiberglass Insulators*, 856 F.2d at 654; *Davis*, 596 F.3d at 859, the Court will exclude Stephenson's March 2017 statements to Mr. Haas that the Maple Tree roots are shallow and non-invasive under Rule 408. Columbia's April 5, 2017 letter purporting to invite the commencement of settlement discussions is thus most fairly viewed as proposing more formal discussions beyond the informal discussions in March 2017. Ultimately, this ruling has no bearing on the outcome of the case because Columbia's own expert arborist witness, Zimar, also acknowledged that Japanese maple trees are shallow-rooted. Thus, the statements by Stephenson would be largely cumulative.

## III. General Claims

Columbia has the burden of proving by a preponderance of the evidence that the Maple Tree unreasonably interferes with its ability to maintain and operate the Pipeline. Although the Court signaled in its summary judgment opinion that evidence of interference specific to this particular Maple Tree would be necessary, Columbia focused much of its trial presentation on the broad argument that the presence of any tree within a pipeline right-of-way presents an unreasonable interference based on federal regulations, industry standards, and Columbia's internal policies, including its "Minimum Guidelines for Construction Near Pipeline Facilities" (the "Minimum Guidelines"). Columbia acknowledges, however, that no federal regulations require the removal of all trees within a pipeline right-of-way or within a certain distance of a pipeline. The primary regulation Columbia relies upon requires that pipeline operators have "written procedures to minimize the hazard resulting from a gas pipeline emergency," including providing procedures for "making safe any actual or potential hazard to life or property." 49 C.F.R. § 192.615(a)(7). Columbia has complied with this regulation by adopting the various internal policies referenced at trial, including the Minimum Guidelines, but it does not necessarily follow that any condition that is inconsistent with those unilaterally adopted procedures constitutes an unreasonable interference with pipeline maintenance. The Minimum Guidelines expressly acknowledge that "[i]n the event that the provisions of an applicable land rights document conflicts with the requirements" in the Guidelines, "the land rights document shall supersede these requirements." Ex. 10 at 1. Likewise, industry standards, though relevant, do not control the determination whether a particular condition violates an easement and unreasonably interferes with pipeline operation and maintenance.

While federal regulations, industry standards, and internal guidelines may be the same or similar, the language of every easement is distinct, and cases of pipeline interference are highly fact-intensive. *Compare D'Abbracci*, 117 P.3d at 1043 (finding that the manner in which a new roadway was constructed did not substantially interfere with an electric company's rights under the easement) *with Grove Ave.*, 357 F. Supp. at 524 (granting an injunction to a gas company to prevent construction of a roadway based on evidence that the specific construction project and the impact of vehicular weight over the pipeline would unreasonably interfere with the company's easement rights). Thus, as the Court held in its summary judgment opinion, any *per se* rule dictating that the presence of the Maple Tree or any tree necessarily constitutes unreasonable interference would be improper, contrary to the ROW Agreement, and contrary to Maryland law. *Haas I*, 341 F. Supp. 3d at 616; *see Rogers*, 967 A.2d at 819; *Miller*, 833 A.2d at 544.

The court in *Grove Avenue* articulated the need for specificity in the context of pipeline cases:

> The critical question in this case is not whether an asphalt crossing, in the abstract, unreasonably interferes with Columbia's safe operation, testing, maintenance, and repair activities, but rather, whether this specific road, in this specific place, built in the specific manner proposed by Grove, would constitute an 'unreasonable' interference.

*Grove Ave.*, 357 F. Supp. at 519. The same holds true in this case. Columbia's burden is to prove that this Maple Tree, in this location, over this particular pipeline, unreasonably interferes with its ability to operate and maintain the Pipeline. For this reason, evidence of other trees whose roots have damaged pipelines or otherwise interfered with pipeline maintenance are probative only to the extent they occurred under factually analogous circumstances. Similarly, the Haases' argument that the Maple Tree does not unreasonably interfere with pipeline operation and maintenance because Columbia has permitted other trees to remain along the side of its easement

on neighboring properties is unpersuasive on its own as justification for the Maple Tree's non-interference. *See Columbia Gas Transmission, LLC v. Vlahos*, 94 F. Supp. 3d 728, 740 (E.D. Va. 2015) (finding that just because a neighboring property owner maintains a fence does not mean that the defendant's fence does not interfere with Columbia's rights under the operative easement); *Columbia Gas Transmission, LLC v. Ott*, 984 F. Supp. 2d 508, 513, 522 (E.D. Va. 2013) (finding that "the fact that Ott's neighbors may currently maintain on *their* property a swimming pool and fence does not directly contradict Parrish's opinion that the improvements Ott maintains on *his* property interfere with Columbia's rights under the ROWs"). Thus, the Court does not find unreasonable interference based on Columbia's internal policies or on Kvasnicka's broad pronouncement that the presence of any tree near a pipeline is unacceptable. Rather, the Court as factfinder must weigh the specific evidence introduced by Columbia for each of its five arguments why the Maple Tree unreasonably interferes with its rights under the easement to determine whether Columbia has met its burden.

## IV.    Specific Claims of Interference

Columbia has acknowledged that there is no evidence that the Maple Tree is presently interfering with pipeline operation, or that its roots are touching the Pipeline or otherwise creating a present need to access the Pipeline at the location of the Maple Tree. Nevertheless, Columbia cites five specific reasons why the presence of the Maple Tree constitutes unreasonable interference on the maintenance of the Pipeline: (1) it interferes with certain forms of pipeline testing; (2) the roots present an unreasonable risk of damaging the Pipeline; (3) it would delay access to the Pipeline in the event of an emergency; (4) it prevents Columbia from servicing the tap; and (5) it obstructs visibility of the pipeline markers, increasing the risk of third party damage to the Pipeline. Columbia asserts that, individually and collectively, these factors are sufficient to

demonstrate that the Maple Tree must be removed. The Court addresses each of these arguments in turn.

### A.      Surveillance and Testing

Routine surveillance of gas pipelines to identify leaks, deterioration of cathodic protection, and other unusual operating or maintenance conditions is required by federal regulation. *See* 49 C.F.R. § 192.613(a). In particular, Columbia argues that the Maple Tree hinders its ability to conduct aerial patrols, which are one method used by pipeline operators to inspect for leaks. In addressing this argument in Columbia's Motion for Summary Judgment, the Court was unpersuaded that Kvasnicka's general assertion that trees interfere with visual inspections from the air and instruments used by the aerial patrols was sufficient to establish that the Maple Tree specifically constitutes an unreasonable interference. *See Haas I,* 341 F. Supp. at 610. At trial, other than reporting that he has now visited the Property, something he had not done before rendering his opinion, Kvasnicka offered no greater specificity. He, Stephenson, and Redd all testified generally that the Maple Tree's canopy was close enough to the Pipeline to violate Columbia's unilateral prohibition on any trees within a pipeline right-of-way and branches within five feet of a pipeline found in Columbia's Right-of-Way Procedure, which Stephenson asserts is premised on the need to conduct aerial patrols. Columbia also offered its Minimum Guidelines, which include the same prohibition. As the Court held in its summary judgment opinion, the fact that Columbia's current unilateral standards may preclude trees within a certain distance of a pipeline does not control the parties' intent in entering into the ROW Agreement, and it does not control the determination of whether there is unreasonable interference. Neither Kvasnicka nor any other Columbia witness testified that this particular Maple Tree has caused any disruption to Columbia's regular aerial patrols or prevented successful aerial inspection of the area near the

27

Maple Tree. Indeed, Redd could not rule out that under certain circumstances, the infrared technology used by aerial patrols might still be able to detect gas leaks through the spaces between the branches.

Even assuming that the Maple Tree's canopy would interfere with an aerial patrol's ability to assess possible gas leaks in the immediate area of the Maple Tree, such limited interference is not unreasonable. First, Columbia's own Facility Patrol and Leakage Inspection Plan provides that a leakage detection survey needs to be conducted only once a year. When asked, Stephenson was unaware of the schedule of aerial surveillance in the area, and no Columbia witness provided any reason that the aerial patrol could not occur in the winter, when the Maple Tree's branches would be bare.

Second, the Facility Patrol and Leakage Protection Plan contradicts the claim that aerial patrols over the Maple Tree are necessary to pipeline maintenance. It specifies that leakage patrols may be conducted by walking, driving, flying, or other methods of observing the right-of-way. The Plan specifically identifies circumstances under which patrols by non-aerial means are required, including where the "canopy on the right-of-way obstructs the pilot or observer's view of the entire exposure," "when vegetation is normally dead or dormant," and where pipelines "cross[] deep or large rivers, or other bodies of water . . . with excessive turbulence or rapids." Trial Ex. 121 at 6. Thus, there are viable and legally acceptable alternatives to aerial patrol, including ground patrols that Columbia continues to use in certain areas. Finally, the claim that interference with aerial patrols unreasonably interferes with maintenance is belied by the fact that for the first 20 years of the Maple Tree's existence, before aerial patrols were implemented, leakage surveys were conducted from the ground.

Other courts have similarly concluded that apparent interference with aerial patrols does not provide a basis to remove a tree or other obstruction. In *Texas East Transmission LP v. Bowers*, 65 F. App'x 791, 796 (3d Cir. 2003), the United States Court of Appeals for the Third Circuit affirmed the district court's finding that a tree's interference with aerial patrols did not require removal of the tree when there were numerous alternative methods of testing for leaks, aerial patrols had been conducted in the area for years without any claim that the tree unreasonably interfered, and there was "no indication that the aerial view cannot be accomplished more effectively in a number of ways—by changing the angle of approach in that phase of the flyby or otherwise." *Id.* at 796. Likewise, in *Grove Avenue*, the Court found that a 26-foot wide asphalt road, wider than the Maple Tree's roughly 18-foot wide canopy in the summer months, would have a *de minimis* impact on aerial surveillance and would not provide a basis to remove the obstruction. 357 F. Supp. 3d at 511, 527.

Accordingly, where there are a number of alternatives to aerial patrol approved by Columbia's own internal guidelines, leakage surveys of the Pipeline must be conducted only once per year, and the Pipeline was monitored from the ground for at least 20 years without issue, the Court concludes that the Maple Tree does not unreasonably interfere with Columbia's ability to conduct leakage surveys.

Columbia's claim that the Maple Tree unreasonably interferes with its ability to conduct a close interval survey is also unpersuasive. As the Court's findings of fact reflect, the Maple Tree does not prevent Columbia from conducting a CIS in accordance with its own procedures. Although the Court has found that the trunk of the Maple Tree does not stand directly over the Pipeline, even if it did, Columbia's guidelines on conducting a CIS provide that the CIS prongs can be placed at intervals of up to 10 feet apart. Where the tree's trunk is no more than 17 inches

wide, there is no need to place a prong in the specific location of the trunk. Moreover, the evidence did not establish that tree roots would prevent accurate CIS readings. Other courts have similarly concluded that the presence of an obstruction does not unreasonably interfere with the ability to conduct a successful CIS. *See id.* at 511, 525 (finding that the presence of an asphalt road would have only a minimal impact on the ability to conduct a CIS and that such a factor alone would not constitute unreasonable interference); *cf. Andrews v. Columbia Gas Transmission, Corp.*, No. 2:05-cv-501, slip op. at 5, 7 (S.D. Ohio March 19, 2007) (noting that although approximately 20 pine trees planted in the easement required a "skip" of that area during the CIS, "the readings from the close interval surveys . . . resulted in acceptable readings that did not compromise the safety of the pipelines") *aff'd* 544 F.3d 618 (6th Cir. 2008); *Swango Homes, Inc. v. Columbia Gas Transmission Corp.*, 806 F. Supp. 180, 183 (S.D. Ohio 1992) (finding that although a CIS cannot be conducted with a shed directly over a pipeline, it could still be performed if the shed were in the easement but not directly above the pipeline).

Beyond the fact that the presence of the Maple Tree would not prevent the conduct of a CIS, there is no record showing that Columbia has ever even attempted to conduct a CIS on the Property. As chance would have it, there is a test station within yards of the Maple Tree that allows for testing of the cathodic protection. Columbia does not conduct a CIS unless such readings indicate a need to do so, and none of the readings from that test station, or other pipeline integrity tests, have revealed a need for a CIS. Thus, the Court holds that any minor inconvenience imposed by the Maple Tree on the ability to conduct CIS does not render the Maple Tree an unreasonable interference with Columbia's easement rights. *See Grove Ave.*, 357 F. Supp. 3d at 511, 525.

**B.    Roots**

Columbia also argues that the risk that the Maple Tree's roots will damage the Pipeline constitutes unreasonable interference with its maintenance of the Pipeline. The parties do not dispute that when tree roots come into contact with a pipeline, they can cause damage to the coating that would require intervention. The parties also do not dispute that there is no evidence that the roots are presently in contact with the Pipeline or negatively affecting the cathodic protection. Instead, Columbia argues that the potential risk is sufficient to establish that the Maple Tree currently presents an unreasonable interference on the maintenance of the Pipeline. In support, Columbia has offered the testimony of Rew, who cited several examples of instances in which Columbia was required to excavate part of the Pipeline and found tree roots wrapped around the Pipeline. It has also offered the expert opinion of Kvasnicka that all trees are a problem, that he has "to assume that the tree roots are interacting with the Pipeline and the coating," and that any tree in the right of way has to be preemptively removed based on his industry experience and "moral compass." 5/22/19 PM #2 Tr. at 32.

Because of the risk of damage that tree roots can cause, the Court does not conclude that there must be evidence of actual contact between tree roots and a pipeline, or an actual emergency relating to a pipeline, before the roots would be deemed to present an unreasonable interference with the maintenance of the Pipeline. Such a rule could unreasonably burden Columbia's federally mandated efforts to ensure the safe operation and maintenance of its pipelines. Under certain circumstances, the presence of a tree in close proximity to a pipeline, by itself, may be sufficient to establish an unreasonable interference because of such potential risk.

Here, however, there is significant countervailing evidence demonstrating that this particular tree presents a lower than typical risk. First, as stated in the findings of fact, at the

31

present time, the roots of the Maple Tree are 20-27 inches below ground, which is well above the depth of the Pipeline, which is four to five feet below the surface. All the witnesses with expertise relating to trees, including Columbia's expert witness, agreed that the specific species of the Maple Tree, a Japanese maple tree, has shallow roots. According to Bloch, the roots of trees of this species typically do not descend lower than 24 inches. He also testified that tree roots tend to stay closer to the surface in clay soil, which Mr. Haas confirmed to be the type of soil present on the Property. Most importantly, although Zimar cautioned against relying only on general characteristics of the species, this particular Maple Tree has a distinct track record. It has been located on the Property, near the Pipeline, for over 40 years with no evidence of contact or interference between its roots and the Pipeline.

Where all of the evidence specific to this particular tree points to a lack of interference with, and significantly lower risk of future interference with, the Pipeline, the Court concludes that the general proposition that all tree roots present a risk to a pipeline is not sufficient to establish that the Maple Tree presents an unreasonable interference and must be removed. Under these circumstances, Columbia needed to present some evidence showing that this particular tree presents an actual risk to the Pipeline.

Columbia has failed to do so. As discussed above, none of the test results, whether from the PIG or the test station, reveal any present risk to the Pipeline from the Maple Tree's roots. None of the Columbia witnesses who testified about prior problems with roots reaching pipelines identified a single instance involving a Japanese maple tree. Columbia's experts never opined that the current distance between the roots and the Pipeline presently interferes with its operation or has created a safety risk, especially where Bloch's uncontroverted testimony was that the ends of tree roots are so delicate that they are comparable to hairs. They did not provide any reason to

believe that the Maple Tree's roots are growing in a downward direction such that they will soon reach the Pipeline and damage it. Notably, Zimar did not test the soil around the Maple Tree to assess whether anything about the conditions there presented a higher risk of deeper roots.

Kvasnicka's sweeping opinion that any tree in a right-of-way presents an unacceptable risk provided nothing specific relating to this Maple Tree or its roots and in any event was so lacking in precision, detail, and a consideration of relevant facts that the Court cannot rely upon it as applied to the Maple Tree. Illustrative of the flaws in his opinion are his statement that he just "assume[s]" that a tree's roots are in contact with a pipeline, an assumption which is in no way grounded in fact. 5/22/19 PM #2 Tr. at 32. Kvasnicka's failure to render opinions specific to the Maple Tree is also illustrated by his ungrounded opinion on the motion for summary judgment that it would take several days to remove the Maple Tree if needed, an opinion which was apparently abandoned at trial and not supported by any evidence, and by his claims about the interference with aerial surveillance offered even though he did not know the specific classification of the Pipeline, which affects the frequency with which leakage surveys are required. *D'Abbracci*, 117 P.3d at 1044 (refusing to credit a utility company expert's testimony where his "calculations and estimates were imprecise and speculative").

The Court therefore concludes that under the facts of this particular case, with a Japanese Maple Tree with shallow roots and a spotless 40-year track record, Columbia has failed to establish that the general risk posed by tree roots necessitates the removal of the Maple Tree as an unreasonable interference with pipeline maintenance. *See Strahm v. Buckeye Pipe Line Co.*, No. 1-10-60, 2011 WL 915575, at *7 (Ohio Ct. App. Mar. 14, 2011) (denying summary judgment to require removal of trees from an easement based on the potential risk of the roots, where there was no evidence that the trees' roots actually or likely interfered with the pipeline).

## C.    Emergency Removal

Columbia further contends that the Maple Tree unreasonably interferes with its maintenance of the Pipeline because, in the event of an emergency need to access the Pipeline at that location, the delay caused by the removal of the tree would be unacceptable. The Court has found that where the proximity to the Pipeline would likely preclude the use of heavy equipment, removing the Maple Tree, including its roots, would take between four and eight hours, depending on whether an air spade could be used as part of a manual dig. Columbia did not introduce evidence establishing that a delay of that length constitutes unreasonable interference. Kvasnicka testified that when a smart PIG gives a reading that shows 80 to 90 percent wall loss on the Pipeline, Columbia must do an "emergency PIG dig" and "get in there right away and confirm if the pig is correct or not correct and then make the appropriate repairs." 5/22/19 PM #2 Tr. at 13. Kvasnicka, however, did not point to any Columbia policy or federal regulation specifying what "right away" means. *Cf. Andrew v. Columbia Transmission Corp.*, 544 F.3d 618, 628 (6th Cir. 2008) (stating that if a smart PIG detects an 80 percent wall loss, the pipeline must be excavated within five days); *Grove Ave.*, 357 F. Supp. at 511 (stating that Kvasnicka "cannot recall a single 'emergency' unscheduled dig under an asphalt road, meaning that the equipment and personnel have always been scheduled in advance"). When Rew testified about his experience digging up tree roots wrapped around pipelines, he simply stated that such situations required excavation and repairs, not that they had to be addressed within hours of detection. Although Kvasnicka referenced the dangers of a gas leak, the only incident he referenced did not involve a tree. No witness testified about a gas leak that had been exacerbated by a delay in accessing a pipeline caused by a tree. Indeed, Columbia's own Facility Patrol and Leakage Protection Plan provides for different leak repair timelines for different grades of leaks, ranging from Grade 1 leaks which

require immediate action, to Grade 2 leaks which require repair within 12 months, to Grade 3 leaks, which "do not justify a scheduled repair" and require a "financial decision based on repair costs versus gas loss." Ex. 121 at 9-10.

Though some gas leaks or other emergencies may require immediate action by Columbia to protect the public if they impair the Pipeline's serviceability, *see* 49 C.F.R. § 192.711(a), Kvasnicka's blanket opinion that no delay is acceptable is not consistent with fact or law. In fact, there are numerous obstacles along a pipeline, such as railroad tracks, roads, and driveways, that are permitted to remain even though some delay would occur if excavation is required. Indeed, there are roads and driveways in the immediate vicinity of the Property that run over the Pipeline. Courts have found that a potential delay of several hours in gaining emergency access as a result of such an obstacle does not render the obstacle an unreasonable interference. *See Grove Ave.*, 357 F. Supp. at 511, 527 (noting that a delay of four to eight hours to dig through a roadway to a pipeline on its own likely would not constitute unreasonable interference); *cf. D'Abbracci*, 117 P.3d at 1044 (holding that where "the need for excavation is unusual," an added cost of $3,000 to $3,500 to excavate a road "would not unreasonably interfere with Mountain Energy's ability to obtain access to the pipeline"). Courts have also found that a delay of up to 10 hours to remove a tree does not constitute unreasonable interference. *See Texas E. Transmission LP*, 65 F. App'x at 795 (affirming the district court's ruling that an oak tree with a two foot diameter whose presence would delay repairs by ten hours did not need to be removed); *see also Texas E. Transmission LP v. Bowers*, No. 01-4488, 2002 WL 77409, at *3 (E.D. Pa. Jan. 17, 2002) (district court opinion); *Twp. of Piscataway v. Spectra Energy*, No. 01-4828 FSH, 2008 WL 4534187, at *7 (D.N.J. Oct. 7, 2008) (after a bench trial, finding that trees would be an inconsequential contributor to any delay in an emergency because the gas company first would have to "evacuate residents, shut off the

pipe valves, and bleed pressure from the pipes before repair work could be safely commenced," all of which would take at least as much time as tree removal). The four to eight hour time period at issue here likewise does not constitute unreasonable interference.

Although Columbia also argues that the delay in reaching the pipeline caused by the tree's presence would lengthen service disruptions to natural gas customers, there was no testimony that service would necessarily be shut down every time a pipeline needs to be accessed. *See Grove Ave.*, 357 F. Supp. at 527 (noting that "in the event of a repair, gas is generally kept flowing unless there is a leak or another reason to believe that there is an unacceptable risk"). Moreover, where the Pipeline is a transmission line, not a distribution line, it does not deliver gas directly to end users. Where Stephenson could not confirm whether and to what extent storage tanks or other backup options are available in the case of a disruption, there was no testimony that an incremental delay of a few hours would actually result in a service disruption to customers that otherwise would not result.

Finally, Kvasnicka testified that if the Court were to order the Maple Tree removed as a result of this case, Columbia would simply cut the tree at grade without digging up the roots. This testimony undermines the purported urgency of accessing the Pipeline, because even if the Maple Tree were removed today, if a leak occurred tomorrow, the same process of using an air spade or hand-digging to remove the roots would be required. No witness testified as to the length of time that a Japanese maple tree's roots would remain in place, and whether any part of the tree or roots could grow back absent removal of the root structure. Thus, Columbia has not established a need to remove the Maple Tree based on potential delay in reaching the Pipeline if needed, particularly when its own proposed removal plan includes a partial wait-and-see approach. Thus, the potential

delay of four to eight hours, without more, does not constitute unreasonable interference. *See Bowers* 65 F. App'x at 795.

**D. Tap**

As outlined in the Court's findings of fact, Columbia has not established the precise location of the tap on the Property—both its depth and its distance from the Maple Tree. Stone's statement that he found "something" with the pipeline locator within 6 to 12 inches of the Maple Tree does not establish that it was the tap rather than underground lights or some other object. Kvasnicka identified GPS coordinates of the tap in the smart PIG data but could not match those coordinates to any specific location on Property.

Where the location was not established, the need to remove the Maple Tree to reach the tap has not been established. Notably, in other cases involving encroachments on pipelines, gas companies have introduced precise diagrams or measurements of the potential excavation zone required to reach a particular part of a pipeline. *See, e.g., S. Star Cent. Gas Pipeline, Inc. v. Cunning*, 157 P.3d 1120, 1123-24 (2007) (noting expert testimony which specified that the proposed excavation site would require a 45-degree angle grade and that the pipeline could be excavated with only 41 inches on one side of the ditch); *Andrews*, No. 2:05-cv-501, slip op. at 12-14 (showing a "detailed plan of an excavation site" and citing an affidavit stating that "a width of six feet at the base of the trench is generally the minimum requirement to permit two workers in the trench at the same time"). Here, Kvasnicka testified that the ditch for an excavation site to reach the tap would have to be "a couple of dozen feet" wide, without any additional detail, specific measurements, or citation to any particular regulation dictating the size of the excavation site. 5/23/19 Tr. at 108. Where the location of the tap has not been shown to be sufficiently close to

the Maple Tree that excavation would require removal of the Tree, the Court concludes that the Maple Tree does not unreasonably interfere with pipeline maintenance based on the tap.

Moreover, Columbia has not even shown a present need to excavate the tap. Despite offering numerous exhibits consisting of federal regulations and Columbia internal policies, and providing testimony on standard industry practice, Columbia has offered no written Columbia policy requiring the automatic remediation and sealing of taps absent adverse test results. Notably, Rew testified that the taps they excavated were addressed because of adverse test results in the vicinity. Tellingly, although Columbia was aware of the tap no later than 2013, it made no effort to excavate it until after the litigation began, and Kvasnicka did not even mention it in his first expert report, suggesting that the focus on the tap is more of a litigation strategy than an operational necessity. Under these circumstances, the Court finds that the claim of a present need to address a tap that has presented no issues for over 40 years and is not the subject of adverse test readings is unconvincing at best. For all of these reasons, the Court concludes that the tap, wherever it is, does not render the Maple Tree an unreasonable interference with Columbia's right to maintain and operate the Pipeline.

### E. Third Party Damage

The final asserted reason for removing the Maple Tree is that it increases the risk of third party damage. However, as stated in its findings of fact, the Court has determined that the Maple Tree does not completely obstruct the view from one pipeline marker to the next, at least from a vantage point between the markers. Moreover the Property is fenced off, and the Haases have agreed, if necessary, to put up additional signs marking the location of the Pipeline and prohibiting trespassing. They testified that they would never allow a third party to dig on the Property without notifying Columbia. Significantly, they have demonstrated, by their confrontation of Columbia

representatives and calling of the police to halt Columbia's efforts to enter the Property without permission and chop down the Maple Tree, that they are vigilant in preventing intruders and unauthorized activity on their land. Thus, any concerns about third party damage based on the presence of the Maple Tree location is purely speculative and does not establish unreasonable interference with Columbia's ability to maintain and operate the Pipeline.

### F. Collective Consideration

Even considering the specific claims of interference together, the Court finds no unreasonable interference. The Maple Tree's impact on surveillance and testing and potential third party damage is minimal, and the claims relating to the tap are unsubstantiated. Although the potential risk of the Maple Tree's roots and the possible delay from removing the Maple Tree in the event of an emergency present more serious concerns, the Court concludes that even in combination, they do not render the Maple Tree an unreasonable interference. In particular, as discussed above, the specific evidence relating to the Maple Tree, including the characteristics of its species and its 40-year track record of non-interference with the Pipeline, distinguish this case from situations in which the potential risk of tree roots could arguably justify removal of a tree in the absence of any present interference. Moreover, in finding that the limited delay for tree removal in the event of an emergency does not constitute unreasonable interference with pipeline maintenance and operation, the Court does not conclude that Columbia is required to wait for a life-threatening situation before it may remove an encroachment that poses a risk to one of its pipelines. Defendants have acknowledged that adverse readings on cathodic protection or other indicators of interference could necessitate action relating to the Maple Tree even before an actual emergency arises. But under present circumstances, and where the ROW Agreement does not bar trees in the easement and requires that the Pipeline be operated below cultivation, the collective

claims of Columbia do not establish that the Maple Tree unreasonably interferes with pipeline maintenance.

## V.    Other Vegetation

Finally, the Court addresses the lilac bush on the edge of the Property that Columbia argues also must be removed under the terms of the ROW Agreement. Although this bush is not mentioned in the Complaint, the parties stipulated in a Joint Status Report that Columbia could seek its removal as part of this case, presumably to avoid future litigation between the same parties. The only evidence that the bush may interfere with Columbia's ability to maintain and operate the Pipeline that was introduced at trial was Exhibit 12-C, a photograph of the pipeline marker just off the edge of the Property with the bush behind it, and testimony by Stephenson and Kvasnicka that the bush is on top of the Pipeline and obscures the marker. For the same reasons cited above, the argument that the presence of this bush unreasonably increases the risk of third party damage to the pipeline fails, where the bush is located within a property fence, the Haases have offered to put up additional signs marking the presence of the pipeline, and both markers can be seen by an individual standing between them. Columbia has offered no evidence of the bush's impact on aerial surveillance, the nature of the bush's root structure and its potential impact on the Pipeline, the potential difficulties in removing it, or the presence of any tap near it. It simply relies on its Minimum Guidelines, which unilaterally bar bushes more than five-feet fall within a pipeline right-of-way. The Court has already concluded that the Minimum Guidelines alone are insufficient to establish an unreasonable interference with pipeline maintenance.

The fact that, without a single measurement and virtually no testimony relating to the bush, Columbia expects the Court to order that the bush be removed is reflective of its approach to this case. In many cases, courts have "given too much latitude to the pipeline companies to unilaterally

interpret and expand their 'rights' under easements," improperly departing from general contract principles. *Strahm*, 2011 WL 915575, at *9-10 (Rogers, P.J., concurring). Columbia has attempted to seize on this trend by trying this case with almost no concrete evidence that the specific vegetation in question interferes with its duties as a pipeline operator and its rights under the language of the ROW Agreement, and instead largely relies on its position that any vegetation of a certain size as described in its unilateral, internal guidelines, must be removed, regardless of the terms of the individual contract. While the Court acknowledges that trees generally can pose risks to gas transmission pipelines, this case is about this tree and this ROW Agreement. In meeting its burden to establish that the Maple Tree violates this particular ROW Agreement by unreasonably interfering with pipeline operation and maintenance, Columbia ultimately falls short and is not entitled to a declaratory judgment or injunction requiring the removal of the Maple Tree. Accordingly, the Counterclaim is moot and will be dismissed.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendants on the claims asserted in the Complaint and will enter judgment in their favor on those claims. The Counterclaim will be dismissed as moot. A separate Order shall issue.

Date: August 19, 2019

THEODORE D. CHUANG
United States District Judge